Argued June 25, reversed and remanded September 10, 1918.

BRUNDAGE *v.* SOUTHERN PAC. CO.

(174 Pac. 1139.)

**Master and Servant—Death of Railroad Employee—Evidence Admissible Under Pleadings—Rules and Regulations.**

1. In action against railroad for death of employee in tunnel collision, evidence of failure to promulgate and enforce rules, tending to show negligence, is admissible under allegations of negligence in operation of train and in failure to have a light on lead car of train or in tunnel.

**Master and Servant—Railroads—Failure to Light Tunnel.**

2. Railroad's failure to have a light in a tunnel 625 feet long and constructed on a seven-degree curve was not negligence, where its

rules required employees operating motor-cars to exercise great caution and use stop signal where view of approaching train was obscured.

**Master and Servant—Railroads—Employee's Death—Tunnel Lights.**

3. In action against railroad for death of employee in tunnel collision between employee's speeder and construction train, railroad's failure to have a light in the tunnel, which was 625 feet long and constructed on a seven-degree curve, where its rules required employees operating speeders to exercise caution and use stop signals, was improperly submitted to jury.

    [As to disobedience of rules or regulations of master as affecting right of servant to recover for personal injuries, see note in Ann. Cas. 1912A, 84.]

**Master and Servant—Death of Railroad Employee—Assumption of Risk—Unlighted Tunnel.**

4. Where railroad telegraph inspector, having for more than 30 days used speeder, and knowing that a tunnel was without lights, and that construction trains backed through such tunnel without lights, was killed while in tunnel through collision with construction train, railroad is not liable; inspector having assumed risk.

**Trial—Instructions—Evidence—Violation of Rules.**

5. In action for death of employee caused by collision in tunnel while employee was riding a speeder, where defendant interposed defense of contributory negligence and a rule requiring employees using speeders to use stop signals or walk when view of track is obscured was introduced in evidence, an instruction, restricting jury's consideration of evidence of violation of such rule to the rate of speed employee was traveling, *held* improper.

From Lane: George F. Skipworth, Judge.

This action is brought under the Federal Employers' Liability Act by the plaintiff, as administrator of the estate of William J. Framhein, deceased, against the defendant, to recover damages for his death while in its employ. Framhein was a telegraph inspector and lineman and it was his duty to keep the telegraph lines of the defendant in repair along its railroad tracks between Reedsport and Eugene in this state. As a part of his equipment he was furnished with a speeder on which he traveled by rail from place to place in the discharge of his duties. On the line of railway between the above-named points there were certain tunnels, one of which was known as Tunnel Number Four, about 625 feet in length and constructed

on a seven-degree curve.  There were no lights in the tunnel and it was dark near the center.

The deceased was first employed by the defendant as a lineman in July, 1910, and while at the time of his death he had been in the employ of the defendant at that particular place for only about thirty days, it appears from the record that at previous times and in other places he had been in the defendant's employ for nearly three years and was an experienced lineman.

On June 26, 1916, about 10:30 A. M., while in the employ of the defendant as a lineman and riding on his speeder in the discharge of his duties, Framhein entered Tunnel Number Four and at about the center thereof was struck by and collided with the lead or front car of a construction train of the defendant which was moving backward, and was almost instantly killed.  The train consisted of a coal-car, a water-car and two tenders driven from behind by a steam locomotive.  There were no lights in the tunnel and none on the construction train.  There is no testimony tending to show that the deceased saw the train or that anyone on the train saw him in time to avoid the accident.

The complaint alleges that the construction train was negligently operated, without due care and without providing or giving any warning to the deceased traveling on his speeder, by the pushing of the train with the said engine backward, through the tunnel, by negligently failing to have any light on the lead car or east end of the train, or to have any lights whatever in the tunnel, and without the fault or negligence of the deceased; that while he was traveling through the tunnel on his speeder in the discharge of his duties, the train collided with Framhein and that such failure and

*neglect* on the part of the defendant was the proximate cause of his death.

The facts alleged and the proof of such facts bring the case under the terms and provisions of the Federal Employers' Liability Act. It is alleged that Framhein was a strong, healthy man, twenty-five years of age, and that he left a widow and a minor child three years of age, who were dependent upon him for support.

The defense was assumption of risk and contributory negligence. After general denials, for a further and separate answer the defendant alleged that the deceased was experienced in his employment; that he knew, understood and appreciated the risk and dangers incident to the use of the speeder upon and along the railroad tracks over which the trains were operated; that it was his duty before entering the tunnel to ascertain the location of any and all trains operating over the railroad in his vicinity and to stop his speeder and listen for any trains that might be in or approaching the tunnel; that it was his duty not to enter the tunnel until he knew that there was no train in or near it and to see that everything was clear through the tunnel before going in with his speeder; and that he knew that trains, engines and cars at any and all times were likely to enter the tunnel and that engines and construction trains were operated backward through the tunnel without any lights thereon and without any lights in the tunnel.

The rules of the company provided that:

"Hand-cars, motor-cars, etc., must be run with great caution at all times and particularly at night and in fogs"; and that: "When the view of approaching trains is so obscured by any cause that there would not be ample time to remove car to avoid being struck by a moving train, stop signals should be used."

There was no rule of the company providing for lights in any of its tunnels, either by day or night, and there was no rule which required lights on any trains or the engines thereof between sunrise and sunset. The testimony is undisputed that the construction train had the right of way over the speeder and over all other trains except passenger trains. There is testimony tending to show that the deceased had knowledge of the rules and regulations by which the defendant managed its trains and by which he was to operate his speeder.

The defendant made motions for a nonsuit and for a directed verdict, both of which were overruled. The jury returned a verdict in favor of the plaintiff for $10,000, $5,000 of which was awarded to the widow and $5,000 to the minor child. Judgment was entered upon the verdict, from which the defendant appeals, making thirty-two assignments of error, among which is the overruling of the motions for a nonsuit and for a directed verdict.    REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. Roscoe C. Nelson, Mr. Ben C. Dey, Messrs. Smith' & Bryson* and *Mr. Coy Burnett,* with an oral argument by *Mr. Nelson.*

For respondent there was a brief over the names of *Mr. Charles A. Hardy* and *Messrs. Devers & Medley,* with oral arguments by *Mr. Hardy* and *Mr. J. S. Medley.*

JOHNS, J.—1. While there are no specific allegations made in the complaint of the failure and neglect to promulgate and enforce rules and regulations, yet under the authority of *Wild* v. *Oregon Short Line Co.,* 21 Or. 159 (27 Pac. 954), the allegations made are broad

enough to permit proof of any such failure and neglect as tending to show negligence. It appears from the record that the plaintiff did not offer any testimony whatever as to any rules or regulations of any kind or for any purpose, or as to the failure of the defendant to adopt any rules and regulations for the conduct of its business, or as to any established usage or custom.

The record shows that the defendant did offer in evidence a printed book or copy of its rules and regulations for the operation of its trains and the government and control of its employees and that such rules and regulations were known as "Standard Rules" and became effective April 1, 1909. It also appears from the application to the defendant for employment, by the deceased, the body of which is in his own handwriting, that he was first employed by the defendant as a lineman on other of its properties in July, 1910, and worked until November, 1911; that he was again so employed in January, 1913, and worked until April, 1914, and again from February, 1916, to April, 1916; that at the time of making his application for his last employment, where he met his death, he signed the following statement:

"I hereby acknowledge receipt of a copy of the rules and regulations for the government of employees of the operating department of this company, and all amendments thereto, and also a copy of the current time table, and agree to familiarize myself with and observe all the same, and to keep advised of such amendments to said rules as may be hereafter made, and have had explained to me the dangerous nature of the service in which I am about to engage."

It also appears from the evidence that on April 21, 1916, the defendant mailed to him from its San Fran-

cisco office a letter advising him of the shipment of the speeder, in which he was thus instructed:

"Also in rounding curves or obscure points have your car under complete control at all times and do not proceed without properly protecting yourself or flagging. Every precaution is to be taken so that the car will not be damaged and yourself injured."

There is no testimony which shows or tends to show that in the operation of any railroad there was any established rule, custom or regulation requiring any kind of a tunnel to be lighted either by day or night. Neither is there any specific evidence which shows or tends to show that between sunrise and sunset there should be a light of any kind anywhere on a construction train passing through a tunnel.

The court instructed the jury that among other grounds of negligence the complaint alleged the following:

"That the said defendant corporation * * negligently failed to have any light upon said train and negligently failed to have any light upon the east end of said train and negligently failed to have any lights in said tunnel of any kind whatever, and which tunnel was about 624 feet long and is built on a curve so that it is dark at all times within said tunnel; and that the said defendant corporation, as aforesaid, so negligently operated said unlighted train through said dark tunnel and without any warning,"

and that the plaintiff claimed that the defendant was negligent in four respects, the last of which is as follows:

"That the defendant negligently failed to have any lights upon the east end of the train and failed to have any lights in the tunnel,"
and then gave the following instruction:

"I instruct you that before the plaintiff would be entitled to recover in this case, he must prove by a preponderance of the evidence that the defendant was negligent in the particulars or some of the particulars alleged in the complaint, and that such negligence, if there was negligence, was the proximate cause of the death of William J. Framhein."

In a number of its instructions the court, in legal effect, told the jury that it could find against the defendant upon any one of the grounds of negligence charged in the complaint. The failure "to have any lights upon the east end of the train" and the failure "to have any lights in the tunnel" were particular grounds of negligence specified in the complaint and by such instructions each of said grounds was submitted to the jury, and under such instructions the jury could have returned its verdict on both or either of them. This squarely presents the questions as to whether the failure and neglect of the defendant to maintain lights in its tunnels is in itself evidence of negligence sufficient to sustain the verdict, and whether the failure and neglect of the defendant to maintain lights upon a construction train going through a tunnel, between sunrise and sunset, is in itself sufficient evidence of neglect to sustain the verdict.

The record shows that the defendant had adopted and had in use since April 1, 1909, certain rules and regulations for the operation of its trains and the control of its employees, known as "Standard Rules," and that the deceased was an experienced lineman and as such had been in the employ of the defendant at different times and places for about three years, and there is strong testimony tending to show that he had knowledge of the existence of such rules. It is provided in Rule 772 of the defendant that:

"All cars must display a white light at both front and rear when operated between sunset and sunrise."

But there is no rule which requires that a light shall be displayed upon an operated car between sunrise and sunset.

In 3 Labatt's Master and Servant (2 ed.), page 2948, the author says:

"The presumption of law is in favor of the sufficiency of the rules adopted by a master for the government of his servants and business, as bearing upon the question of negligence of the master rendering him liable for injury to a servant.   Unless those rules are shown to be 'palpably unreasonable or clearly insufficient,' the master ought not to be charged with negligence on account of their adoption and use,"

and on page 2951 of the same volume it is said:

"But in the absence of evidence showing that rules would be useful and feasible under the circumstances, the master cannot be found negligent in not having promulgated them.   It is, therefore, error to leave the case to the jury where the plaintiff has offered no evidence which indicates that other employers in the same business had promulgated any such rule, or that the suggested rule was necessary or practicable, or that the necessity and propriety of making such a rule was so obvious as to make the question one of common knowledge and experience.   Especially is it unwarrantable to infer culpability in the absence of such evidence, where it appears that the rules actually promulgated by the defendant supplied an adequate protection against the occurrence of accidents like the one in question, so far as they could be prevented by rules."

In *Corcoran v. Delaware, L. & W. R. Co.*, 126 N. Y. 673 (27 N. E. 1022), the court said:

"We think that there was no proof of neglect on the part of the defendant to make and promulgate suitable and proper rules for the information and government

of its employees, to warrant the submission of the case to the jury.''

In 26 Cyc., page 1159, it is said:

''While the adoption or nonadoption of rules by others in the same line of business is not conclusive as to the duty of the master in this respect, yet as a rule his adoption of such regulations as are in general use will relieve him from liability; and where there is no evidence that any rules relating to the business had been adopted by others, or were necessary or practicable, he is not chargeable with negligence in failing to adopt any.''

In 18 R. C. L., page 574, we find:

''But, ordinarily, the usage of employers generally is the standard by which the necessity for a rule is to be determined. The fact that no rule covering the circumstances out of which the injury arose has been promulgated by other employers in the same kind of business points very strongly to the conclusion that the failure to promulgate such a rule is not actionable negligence.''

In *Grant* v. *Union Pacific Ry. Co.*, 45 Fed. 673, in which SHIRAS, J., orally charged the jury, the syllabus lays down this rule:

''It is not negligence on the part of a railroad company to have switches without lights on them in its yard, unless it appears that it was the common and uniform practice to have such lights, and that the switchmen had a right to expect them.''

In *Ferrari* v. *Beaver Hill Coal Co.*, 54 Or. 210 (94 Pac. 181, 95 Pac. 498, 102 Pac. 175, 1016), subdivision 19 of the syllabus is as follows:

''The question whether the master was at fault in failing to adopt suitable rules is not for the jury, unless there is something in the testimony from which the inference may be drawn that it was practicable to have

provided against the occurrence of the accident complained of by such a rule.''

In *Wagner* v. *Portland*, 40 Or. 389–404 (60 Pac. 985; 67 Pac. 300), this court holds:

''The servant assumes the dangers of the employment to which he voluntarily and intelligently consents, and while ordinarily he is to be subjected only to the hazards necessarily incident to his employment, if he knows that proper precautions have been neglected, and still knowingly consents to incur the risk to which he will be exposed thereby, his assent dispenses with the duty of the master to take such precautions. * * The question whether the defendant was at fault in omitting to adopt suitable rules is not one for the jury, unless there is something in the testimony from which the inference may be drawn that it was practicable to have provided against the occurrence of the accident complained of by such a rule. * * If, notwithstanding they were in fact necessary and practicable, it was a matter susceptible of proof, by showing that other municipalities, companies, or persons engaged in handling electrical machinery and appliances for generating and utilizing electrical currents had adopted and put into operation such rules, with serviceable results, or by the testimony of persons possessing peculiar skill and experience in the construction, repair, management and operation of such machinery and appliances. No such proof is to be found in the record, and hence a case has not been made in this particular upon which to put the question of negligence of the defendant in omitting the adoption and promulgation of the rules insisted upon to the jury.''

In *Blust* v. *Pacific States Telephone Co.*, 48 Or. 34, 37 (84 Pac. 847), this court says:

''The evidence shows that he was an experienced lineman. He had worked at that business for several years, and was accustomed to putting up cables of the

kind which he was at work on when injured. He was familiar, not only with that character of work in general, but with defendant's method of doing it in particular. * * The case is ruled by the established principle that a servant entering or continuing in the employment of a master, with knowledge of the defective appliances used by him or the imperfect method of his work, without objection or complaint, assumes the added risk caused thereby, and cannot recover for an injury resulting from the use of such defective or insufficient method. * *

"A servant who voluntarily enters the employment of another, with knowledge of the defective appliances or methods used by that other, cannot be heard to say that he did not appreciate or realize the danger where the defect was obvious and the danger would have been known and appreciated by an ordinarily prudent person of his intelligence and experience."

In *Chadwick* v. *Oregon-Wash. R. & N. Co.,* 74 Or. 19, 30 (144 Pac. 1165), this court, through Mr. Justice BURNETT, lays down this rule:

"It is requisite that the defendant should make suitable rules for the movement of its rolling stock. This obligation is due not only to its employees but also to the general public who patronize it in its capacity as a common carrier. Reasonable regulations thus devised become the standard by which care or negligence is determined. Custom may be used as the means of interpretation, but cannot be admitted to contradict explicit rules and positive orders. This is on the principle that as the admitted rules known to the plaintiff govern the relation between him and his employer, they are in a sense part of the contract of his employment."

The complaint alleges that:

"Said William J. Framhein was required to ride through said tunnel on the said motor car"; and that: "He was required to travel on said motor car on said line of railway"; that: "He was required to ride

through what is known as Tunnel Number Four on said line of railway"; and that he: "Was proceeding through said tunnel on said motor car in accordance with his said duties."

The answer alleges that:

"The said William J. Framhein suffered the injuries from which he met his death as a result of causing a motor car or speeder, then being operated by mechanical power, on which he was riding, to come into collision with a locomotive in Tunnel Number Four."

" * * And in connection with the said employment was required to ride on a motor car operated by mechanical power, over the line of railroad of the Willamette Pacific Company in Lane County, Oregon."

Under such allegations the question is settled that the deceased was riding on his speeder at the time of the collision.   Rule 772 of the company provides that motor cars

"must be run with great caution at all times and particularly at night and in fogs" and that "when the view of approaching trains is so obscured by any cause that there would not be ample time to remove the car from the track before being struck by a train * * stop signals should be used in either or both directions. * * Employees operating inspection cars (motor cars or velocipedes) who have not enough assistance to flag in either or both directions when necessary as herein prescribed, must walk with their cars until the view for a safe distance is not obscured in either direction."

The letter of instruction of April 21, 1916, required the deceased in rounding curves or obscure points to have his car under complete control and not to proceed "without properly protecting" himself or flagging; and there is ample testimony tending to show that the deceased had knowledge of such rules.

2, 3. How and upon what theory can the defendant be liable for negligence to have and maintain lights in

its tunnels, when it is a matter of common knowledge that no lights are kept or maintained in any railroad tunnel anywhere in the state, either by day or night? We are of the opinion that under the facts disclosed by the record the failure to maintain lights in the tunnel was not an act of negligence and ought not to have been submitted to the jury. There is not any evidence as to whether there should have been a light on the front or lead car of a construction train, which had the right of way, going backward through such a tunnel between sunrise and sunset, or that modern and approved methods of railroading require or do not require such a light; neither counsel has cited any authority on that point, and for such reasons we are not inclined to pass upon that question at this time.

4. On the question of assumption of risk the case of *Wagner* v. *Portland, supra,* is authority that if the deceased knew that there were no lights in the tunnel and that construction trains were operated through the tunnel without lights, between sunrise and sunset, and, having such knowledge, consented to accept, and continued in, his employment, his assent would dispense with the duty of the defendant to provide such lights. The deceased was in the employ of the defendant and using the speeder on its tracks for more than thirty days prior to his death and there is evidence from which the jury could have found that he knew there were no lights in the tunnel. If he did have knowledge of the want of such lights in the tunnel and the operation of construction trains backward through the tunnel without such lights, he assumed the risk, and the absence of such lights, if a defect, would be one of which he would have no right to complain.

5. The court gave the following instruction:

"However, the only evidence in this case which you can consider as a violation of Rule 772 is the evidence with reference to the rate of speed which Framhein was traveling at the time of the accident."

That instruction was clearly wrong. Under it the jury would have no right to consider whether the deceased had complied with, or violated, any of the terms or provisions of Rule 772 or the letter of instruction of April 21, 1916, for the operation of his speeder.

The judgment of the Circuit Court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

McBRIDE, C. J., concurs.

HARRIS, J. (Concurring Specially).—While riding on a motor car or speeder William J. Framhein was killed by colliding with a train in tunnel No. 4 on the Willamette Pacific Railroad which extends from Marshfield to Eugene where physical connection is made with a main line of the Southern Pacific system. The Willamette Pacific Railroad was still in course of construction when the fatal accident occurred on June 26, 1916, and was still under the control of the defendant's construction department, although a mixed train ran according to a regularly issued time-table and a tri-weekly freight train was "run extra" on a schedule which was issued "merely as a guide and information for shippers and others who may inquire as to the proper time that these trains will reach certain stations" and without "any idea of controlling movement of the trains which will run extra." When proceeding from Marshfield to Eugene the mixed train was called No. 1 and when running from Eugene towards Marshfield it was known as train No. 2. The tri-weekly freight train was designated as train No. 251 when

proceeding towards Eugene and as No. 252 when running towards Marshfield.

It will be necessary to remember the names of a few of the stations and their relative locations. Noti is 18 miles from Eugene. Traveling towards Marshfield it is 10 miles from Noti to Walton, 40 miles from Walton to Cushman, about 5 miles from Cushman to Canary and nearly 4 miles from Canary to Lane. It is about 1,000 feet from the Eugene end of tunnel No. 4 to the switch at Canary. This tunnel is 624 feet in length and describes a seven degree curve from portal to portal. The curve does not immediately become a straight line at either end of the tunnel. Emerging from the Eugene end of the tunnel the track continues to describe a seven degree curve for about 20 feet from the portal and from that point it is reduced to four degrees "on back to a point about 400 feet toward Canary, and then it tapers from four to nothing, about 800 feet." Leaving the Marshfield end of the tunnel the seven degree curvature continues for a distance of about 300 feet. One witness testified that, standing at the whistling post "you can see back to the tunnel from there, and you can see about 100 feet the other way." The accident occurred about 10:25 A. M., and at or near the center of the tunnel.

One witness said that "it is quite dark in the center" of the tunnel and "you have to get out on the out end of the ties on the outside of the curve to see either way, from the center." Referring to the center of the tunnel, another witness testified that "it is not quite so dark as a very dark night. You can probably see your hand before you by putting it up pretty close to your face"; but "if the sun is right, you can see the rails all the way through as you walk through it." The fireman stated that "in the center of it, it is not quite

as dark as night, but it is dark in there." F. A. Feickert, a civil engineer, testified that

"there is always a reflection on the rail of the light from the portal. Standing at this end of the tunnel, you can't see any light clear into it. You get about halfway and you could see the light from the other end."

The work train left Canary on the morning of June 26th and proceeded two or three miles beyond Lane to a place where a steam shovel was at work. Cars were loaded with dirt and the work train returned to Lane where the dirt was dumped along the track. The work train kept the steam shovel supplied with water and it became necessary to go for water to Canary where the nearest water tank was located. The locomotive with its tender and a reserve tender behind it and a gondola coal-car and a water-car in front of it was uncoupled from the remainder of the train, and was started for Canary with an engineer, a fireman and two brakemen. The caboose and other cars which formed "the remainder of the train" were left at Lane in charge of the conductor who did some clerical work while the rest of the crew were making the trip to Canary. There was no accessible turntable and the locomotive was run backwards with the reserve tender forming the front of the train. The work train was obliged to protect itself against trains numbered one and two and trains numbered 251 and 252, but it had the right of way as against all other trains. Train No. 2 was not due at Canary until 10:56 A. M. and consequently at the time of the accident the work train was entitled to the right of way as against all trains. No report was made to the dispatcher, who was at Noti, before leaving Lane for train orders because no orders were

needed; and "there was no report of the movement of the train to anybody."

Clarence H. Gaffney, one of the brakemen, testified that when they left Lane he "caught the rear end of the tank"; and in this particular he is corroborated by the engineer, fireman, conductor and Martin Dillon, the foreman of construction. C. G. Landerking says that while standing near the track and two or three hundred feet from the entrance of the tunnel he saw "a brakeman standing about the middle of the" reserve tender, which was the first car to enter the tunnel. Otto Schulz, a boy ten years of age, says that he saw more than one man on the cars and he saw "they were standing all around on the cars, and sitting down," and that "most of the men that I saw was on top of the car." The engineer and fireman state that Gaffney remained on the end of the tender from the time they left Lane until the collision. Gaffney testified that when he caught the rear end of the train he then sat "on the buffer beam with one foot on the step and the other on the train line, the angle cock"; and that he "stayed there until Framhein hit us in the tunnel." No witness testified directly that there was no person on the end of the train at the place where Gaffney claims to have been. The only evidence tending to show that Gaffney was not on the end of the train consists of such inferences as may be drawn from the testimony of Landerking and Schulz.

The engineer says that the bell was ringing and Gaffney also states that he heard the bell ringing as the train approached the tunnel. The fireman explained that the bell was rung by an automatic-air ringer and that he turned on the valve which started the automatic ringer at a point about 200 yards from the en-

trance of the tunnel. No witness testified that the bell was not ringing.

There is a "whistle-post" for the tunnel about 62 paces from the portal. The engineer stated that the whistle was blown about one half a mile from the tunnel and also at a point about 100 yards from the entrance of the tunnel. The fireman testified that the whistle was blown "a quarter or a half the other side of the tunnel" and also at the whistle-post. Landerking said that "it whistled when it was off about 200 or 300 feet from the entrance to the tunnel." Otto Schulz says that he was with his uncle C. G. Landerking and heard the whistle before the train entered the tunnel. S. T. Evans was three or four hundred feet from the tunnel when he heard the whistle. Gaffney says that the whistle was blown just before the train entered the tunnel. There is no evidence that the whistle was not blown.

The speed of the train when entering the tunnel was estimated by the engineer at about eight miles per hour, by the fireman and Gaffney at eight or ten miles, and by S. T. Evans at five, six or seven miles per hour. C. G. Landerking said that the train was going "pretty nearly as fast as the passenger trains run on the same ground now." However, there is no evidence to indicate the speed of such passenger trains. The boy, Otto Schulz, said:

"I think it was going pretty fast. It was the first trains I ever saw much."

When speaking of the collision, Gaffney stated that "I seen the shadow of the speeder on the curve and heard the engine working"; and when asked how far the speeder was from him "at the time" he answered:

"I would judge fifteen or twenty feet, when I first seen it" and "it looked to me like he was making twenty or twenty-five miles an hour."

Gaffney says that when he first saw the shadow "I hollered to the engineer to plug her," which in railroad parlance means to apply the emergency brake.

Fred L. Kirby, the train dispatcher, was stationed at Noti. There was an agent and a telephone at Cushman and there was a telephone at Canary. Kirby explained that they "had two cases of wire trouble, one at Walton and one at tunnel 5"; that on the morning of June 26th Framhein, who was then at Walton, asked him "for a line-up"; that he gave Framhein

"the line up as far as Cushman. I told him I knew nothing of Mr. Dillon's work train and for him to be on the lookout for Mr. Dillon."

There is no evidence to show whether Framhein did or did not make any inquiries of the agent at Cushman.

Olaf Larsen testified that Framhein stopped his speeder where the witness was at work on the drawbridge "out of Cushman" and that Framhein told the witness "I am going down the line. I don't know, maybe I am going to Gardner," whereupon Larsen warned Framhein to "look out" for Dillon's work train. There is no evidence to indicate whether Framhein attempted to use the telephone at Canary.

Aside from the testimony of Gaffney, a conversation that Kirby once had with Framhein and a talk which Oliver A. Charlton, who was in charge of the signal construction work, had with Framhein, there is no evidence relating directly or indirectly to the speed at which Framhein was traveling when killed except the testimony of Fred B. Knoaper who says that Framhein was traveling at about six miles per hour when between "a quarter and half a mile" north of tunnel 3. The

length of tunnel No. 3 is 2,135 feet; and it is about a quarter of a mile from the south portal of tunnel 3 to the north portal of tunnel 4.

There were no lights in the tunnel and none on any part of the train. The engineer said that he could not see behind the tank and he admitted that he had testified at the coroner's inquest that from his position in the cab he could not see "very far on account of the darkness; right where the accident happened I could not see at all." The engineer testified that he "went to work there the first day of May"; and when asked "how many times in a day would you go through that tunnel?" he answered: "Well, always twice" and backwards "at least once."

Gaffney and Dillon both stated that the train was operated through the tunnel exactly the same as on previous days. However, Gaffney testified that if the train had been going forward instead of backward "he [the engineer] probably would have lighted the headlight." There is no evidence that lights were ever used when backing the train through tunnels and there is no evidence that Framhein had knowledge of the manner in which the work train was actually operated through tunnels.

The decedent was an experienced lineman and had worked for the defendant at different times, although the last period of employment began about six weeks prior to his death. During the four days immediately preceding his death, Framhein and his family lived at Cushman but during the prior portion of the six weeks of the last period of his employment he and his family lived at Reedsport, a station between Lane and Marshfield.

The company's business and Framhein's employment bring the action within the Federal Employers'

Liability Act. Contributory negligence can be pleaded for the purpose of reducing the amount of recoverable damages but it is not a complete defense as it was formerly. Assumption of risk as a defense is abolished only where the carrier has violated some statute enacted for the safety of employees; and, therefore, since the carrier is not charged with the violation of any statute adopted for the safety of employees, the defense of assumption of risk is available to the defendant: *Jacobs* v. *Southern Ry. Co.*, 241 U. S. 229 (60 L. Ed. 204, 36 Sup. Ct. Rep. 588).; *Morata* v. *Oregon-Wash. R. & N. Co.*, 87 Or. 219, 225 (170 Pac. 291). The answer denies that the defendant was negligent and then pleads contributory negligence and assumption of risk.

The plaintiff is not entitled to recover unless the defendant was guilty of negligence. A complainant must now, as before the adoption of the Federal Employers' Liability Act, allege and prove that the carrier was negligent. The plaintiff alleges that the company was negligent in the following particulars: (1) the train was operated without any schedule; (2) the train was operated without any flagman on front of the same; (3.) the defendant operated the train without "providing or giving any warning in any way whatever" to the decedent; (4) the defendant operated the train at a high rate of speed; (5) the defendant "failed to have any light upon said train and negligently failed to have any light upon the east end of said train"; and (6) the defendant "failed to have any lights in said tunnel of any kind whatever."

Actionable negligence involves three elements: (1) The existence of a duty; (2) failure to perform that duty; and (3) injury or death proximately resulting from such failure. If there is no duty there is no

negligence: 23 Am. & Eng. Ency. Law (2 ed.), 732; *Kansas City Southern Ry. Co.* v. *Langley* (Okl.), 160 Pac. 451. It becomes necessary, therefore, to ascertain what duty the defendant owed Framhein before we can determine whether a failure to do any of the things specified in the complaint would be actionable negligence.

The decedent was not a trespasser but he was an employee whose duties required him to travel along the track on the speeder which the defendant had furnished him to be used for that purpose. The law imposed upon the defendant the duty of exercising the degree of care which an ordinarily prudent man would have exercised under the same circumstances. The company was obliged to employ such precautions as the imaginary ordinarily careful man would have employed for the protection and safety of its employees. While no person on the work train knew that Framhein was in the tunnel yet in the language of the engineer; "I knew there was speeders on the road, or had been right along. * * I didn't know where they were. I knew there had been speeders along all the time." The railroad company is obliged to give reasonable warning of the approach of its train when, under all the circumstances, the presence of and danger to its employees is reasonably to be anticipated: *Louisville &· N. R. R. Co.* v. *Bays' Admr.,* 142 Ky. 400, 402 (134 S. W. 450, 34 L. R. A. (N. S.) 678) ; *Southern Ry. Co.* v. *Sanders,* 145 Ky. 679 (141 S. W. 77) ; *Grow* v. *Oregon Short Line R. Co.,* 44 Utah, 160, (138 Pac. 398, Ann. Cas. 1914B, 481) ; *Oliver* v. *Roach,* 31 Ky. Law Rep. 284 (102 S. W. 274) ; *Wilhelm* v. *Missouri O. & G. Ry. Co.* (Okl.), 152 Pac. 1088; 2 Thompson on Negligence (2 ed.), 462.

Here was a work train which in the language of the conductor "was liable to be anywhere at any time"; it was run backwards into a tunnel built on a seven degree curve so that a person walking or riding between the rails could not, when at the center of the tunnel, see either way; and, moreover, it was dark near the center of the tunnel though "not quite so dark as a very dark night." The company furnished Framhein a speeder so that he could perform the duties assigned to him; and in the performance of those duties he also, to borrow the words of the conductor, "was liable to be anywhere at any time." The company not only gave him the right to use the track but it expected him to do so. It is true that he was bound to be on the lookout for trains and to yield the track to all trains and his use of the track was governed by rules promulgated by the company; but the duty prescribed for Framhein did not necessarily "relieve the employees in charge of the train from all obligation to be watchful on his account": *Brunell* v. *Southern Pacific Co.*, 34 Or. 256, 262 (56 Pac. 129). Indeed, the company itself recognized that the location and surroundings were such as to require a warning every time a train entered the tunnel, by planting a "whistle-post" 62 paces from the portal as a notice to the engineer to blow the whistle at that place before entering the tunnel. Assuming that it was the duty of the defendant to warn employees in the tunnel of the approach of the train it yet remains to be determined whether the defendant performed that duty.

One of the specifications of negligence contained in the complaint is an act of commission while the others are acts of omission. The plaintiff claims that the train was run too fast; that it was run without a schedule, without a flagman at the front of the train, without

blowing the whistle or ringing the bell, without a light on the end of the train and without a light in the tunnel.

The court properly instructed the jury that there was no evidence to sustain the charge of excessive speed. There is no evidence whatever to show that the whistle was not blown or that the bell was not rung. Every witness who testified about the whistle said that it was blown. No witness testified that the whistle was not blown. There was not even negative testimony from any witness that he did not hear a whistle. Indeed, C. G. Landerking, one of the witnesses for the plaintiff, stated that the whistle was blown when the train "was off about two hundred or three hundred feet from the entrance to the tunnel." Every person who testified concerning the bell said that it was rung. No witness stated that he did not hear the bell. If one or more witnesses in a position to have heard the whistle or the bell had testified that one was not blown and that the other was not rung or that he did not hear either the whistle or the bell then it would have been a question for the jury to determine what the fact was: *Smith* v. *Southern Pacific Co.,* 58 Or. 22, 33 (113 Pac. 41, Ann. Cas. 1913A, 434) ; *Morata* v. *Oregon-Wash. R. & N. Co.,* 87 Or. 219, 223 (170 Pac. 291) ; but all the evidence, including the plaintiff's evidence in chief, was to the effect that the whistle was blown at the whistle-post and all the testimony was likewise to the effect that the bell was rung. If it was the duty of the defendant to ring the bell and blow the whistle then the defendant performed that duty. There is affirmative evidence of a "whistle-post" for the tunnel and all the evidence upon the subject is to the effect that the whistle was blown at a place opposite or near the "whistle-post." If upon a retrial the evidence is the same as the record presented to us the court should

instruct the jury that there is no evidence to sustain the charge that the bell was not rung or to support the claim that the whistle was not sounded. Rule 31 promulgated by the defendant requires the engine bell to be rung on approaching tunnels and until they are passed and the whistle to be sounded at all whistling-posts. However, sounding the whistle or bell does not necessarily acquit the railroad company of negligence for the reason that the circumstances may be such as to make it the duty of the company to do more than to blow the whistle and ring the bell: 33 Cyc. 812, note.

While there was no evidence that Gaffney was not riding on the end of the front car except the inferences to be drawn from the evidence of Landerking and Schulz yet their testimony and particularly that of Landerking made it proper for the court to ask the jury to decide whether Gaffney was in the middle and on top of the reserve tender or whether he was on the buffer beam where he claims to have been. Rule 102 declares that when cars are pushed by an engine "a flagman must take a conspicuous position on the front of the leading car," a position in the middle of the top of the car would not be on the front of the car; and hence it was a question of fact for the jury to decide whether Gaffney was on the front or in the middle of the car. The defendant is chargeable with negligence if Rule 102 was violated; but, of course, the defendant would not be liable for that act of negligence unless there was a causal connection between such negligence and the death of Framhein.

The defendant earnestly insists that it was under no obligation to have a light on the forward end of the train while backing the engine through the tunnel with its tender and a reserve tender forming the front end of the train. Many and probably most of the au-

thorities declare that it is negligence to run a train in the night-time without a light. It is not necessary for the purposes of the instant case to decide whether running a train backward without a light in the night-time is as a matter of law a violation of the company's duty to its employees but it is sufficient to say that it would at least be a question of fact for the jury to determine whether running a train backward without a light in the night-time would be a failure to do what would be done by an ordinarily prudent man: *Southern Ry. Co.* v. *Sanders,* 145 Ky. 679 (141 S. W. 77); *Hammett* v. *Southern R. Co.,* 157 N. C. 322 (72 S. E. 1077); *Oliver* v. *Roach,* 31 Ky. Law Rep. 284 (102 S. W. 274); *Burling* v. *Illinois Cent. R. R. Co.,* 85 Ill. 18; *Kansas City Southern Ry. Co.* v. *Langley* (Okl.), 160 Pac. 451; *Hargrave* v. *Shaw Land etc. Co.,* 111 Va. 84 (68 S. E. 278, Ann. Cas. 1912A, 151); 23 Am. & Eng. Ency. of Law (2 ed.), 757; 33 Cyc. 958. The need of a light arises when darkness exists. It is because of the darkness that a light is needed. The sun may be below the horizon and thus cause darkness, or it may be above the horizon and yet its rays may be shut out and thus cause darkness; but in either event the need of a light on a train results from the condition of darkness rather than from the cause of that condition; and hence, reasoning by analogy, if a light is needed between sunset and sunrise because it is dark it may also be needed between sunrise and sunset in a tunnel where the condition of darkness exists. The defendant's motions for a nonsuit and a directed verdict were properly overruled.

The decedent assumed both the risk of the work train running without a schedule and also the risk of the tunnel itself being unlighted. Framhein assumed all the risks that were ordinarily incident to his employ-

ment and also extraordinary risks which he knew, or ought to have known, and appreciated: *Galvin* v. *Brown & McCabe,* 53 Or. 598, 611 (101 Pac. 671). A railroad company is not bound to install lights along the entire length of its tracks so that the right of way may be lighted in the night-time; nor was there any independent duty to install lights in the tunnel. For all practical purposes it is probable that a lighted train in an unlighted curved tunnel would be more likely to give notice of an approaching train than would an unlighted train in a lighted tunnel. However, even though it be supposed that it was the duty of the defendant to light the tunnel, nevertheless the failure of the company to install lights in the tunnel does not make it liable. It is conceded that the tunnel never had been lighted. Framhein knew that the tunnel was dark, because in the performance of his duties he necessarily passed through it from time to time and consequently if the darkness of the tunnel was an extraordinary peril produced by the negligence of the company it was a peril which Framhein must be deemed to have assumed.

The defendant seeks to apply the doctrine of assumed risk to the failure to maintain a light on a train while backing through the tunnel. It is true that the evidence is to the effect that the train was backed through the tunnel on June 26th in the same manner in which it had previously been backed, but there is no evidence that Framhein knew of this practice; and therefore if it was negligence not to maintain a light on the train the risk was an extraordinary peril unknown to Framhein and not assumed by him: 3 Labatt on Master and Servant (2 ed.), p. 3203; *Barley* v. *Southern Ind. R. Co.,* 30 Ind. App. 406 (66 N. E. 72).

The decedent knew that the work train was run without a schedule. Kirby warned Framhein before he left Walton; Larsen warned him at the bridge near Cushman; the purpose for which the train was used probably made a schedule impracticable; and therefore, even though it be supposed, without deciding, that it was negligence to run the work train without a schedule it was a risk which Framhein assumed.

Aside from and independent of the requirements of Rule 772 and the instruction contained in the letter of April 12, 1916, it was the duty of Framhein to exercise care to protect himself; and if he failed to exercise reasonable care to discover the approach of the train he was negligent: *Hawley* v. *Chicago, B. & Q. Ry. Co.*, 71 Iowa, 717 (29 N. W. 787).

The letter advising Framhein of the shipment of the motor car warned him

''in rounding curves on obscure points, have your car under complete control at all times and do not proceed without properly protecting yourself or flagging.''

Rule 772, so far as material here reads as follows:

''Hand cars, motor cars (section and inspection cars), push cars, gravity cars, and velocipedes must be run with great caution at all times and particularly at night and in fogs. When the view of approaching trains in either direction is so obscured by any cause that there would not be ample time to remove the car from the track before being struck by a train running at maximum allowable speed, stop signals must be used in either or both directions, as may be necessary.

''Employees operating inspection cars (motor cars or velocipedes) who have not enough assistance to flag in either or both directions when necessary, as herein prescribed, must walk with their cars until the view for a safe distance is not obscured in either direction.

"All cars must display a white light to both front and rear when operated between sunset and sunrise. * * "

If Framhein disobeyed Rule 772 by riding on instead of walking with the speeder and if such disobedience was causally connected with the collision then he was guilty of contributory negligence: 3 Labatt on Master & Servant (2 ed.), § 1281; 18 R. C. L. 659; 26 Cyc. 1267. Both the plaintiff and the defendant allege that Framhein was riding on the speeder. The complaint avers that the decedent "was required to ride through said tunnel No. 4 on the said motor car * * and in so doing * * " was struck by the train. Again, the plaintiff says in his complaint that the train ran into him while he "was proceeding through said tunnel on said motor car." The answer alleges that Framhein met his death by causing a motor car "on which he was riding" to collide with the train. If the view of an approaching train was so obscure that there would not be ample time to remove the speeder from the track before being struck by a train running at maximum allowable speed then it was the duty of Framhein, under Rule 772, to walk with his car, until the view for a safe distance was not obscured in either direction. This phase of Rule 772 was not submitted to the jury in any manner; but the court instructed the jury that "the only evidence in this case which you can consider as a violation of Rule 772 is the evidence with reference to the rate of speed which Framhein was traveling at the time of the accident." The question of the duty of Framhein to walk "until the view for a safe distance is not obscured" should be submitted to the jury upon a retrial.

Two applications for employment, one dated October 25, 1915, and the other dated April 16, 1916, were re-

ceived in evidence. Each of these applications purports to be signed by William J. Framhein and both acknowledge receipt of a copy of the rules and regulations for the government of employees of the operating department of the company; and each application also contains an agreement on the part of Framhein to familiarize himself with and observe all the rules and regulations. If Framhein signed the applications for employment, and received a copy of the rules and was able to read he must be deemed to have had knowledge of Rule 772 since he had a reasonable opportunity to familiarize himself with the rules: *Georgia Pacific R. Co.* v. *Dooly,* 86 Ga. 294 (12 S. E. 923, 12 L. R. A. 342, 345); *Darracott* v. *Chesapeake etc. R. R. Co.,* 83 Va. 288 (2 S. E. 511, 5 Am. St. Rep. 266); *Little* v. *Southern Ry. Co.,* 120 Ga. 347 (47 S. E. 953, 102 Am. St. Rep. 104, 66 L. R. A. 509); 18 R. C. L. 661; 3 Labatt on Master & Servant (2 ed.), § 1133.

The judgment should be reversed and the cause remanded for a new trial.

BEAN, J., concurs.