Argued December 12, 1918, affirmed February 18, 1919.

SHIELDS v. W. R. GRACE & CO.

(179 Pac. 265.)

**Master and Servant—Injury to Employee—Negligence of Employer—Evidence of Custom.**

1. In action for injuries to employee while loading wheat sacks in hold of ship from fall of sack from chute, evidence that it was not customary to use nets or hatch covers to safeguard employees working in hold of ship was immaterial, where there was evidence that such nets were on board ship, and, if used, would have prevented injuries.

**Master and Servant—Safe Place to Work—Use of Safeguards—Customs of Other Employers.**

2.  Employer's failure to protect employees loading wheat sacks in hold of ship from fall of sacks from chutes by nets or hatch covers was negligence, though it was not the custom among employers in the same business to take such precaution.

**Master and Servant—Duty of Employer—Safety Appliances.**

3.  It is the master's duty to use reasonable care to furnish safe appliances for performance of work and to see that appliances are kept and maintained in reasonably safe condition.

**Master and Servant—Delegation of Duty.**

4.  Employer cannot delegate his duty to provide safe place in which to work and safe appliances wherewith to work.

**Master and Servant—Safety Appliances—Negligence.**

5.  Employer's failure to protect employees loading wheat sacks in hold of ship from fall of sacks from chute by installation of net, where there were two gangs lowering wheat into hold through same hatchway, was negligence.

> [As to the master's duty to furnish safe appliances and machinery, see notes in 34 Am. Rep. 621; 54 Am. Rep. 726; 57 Am. Rep. 727.]

**Master and Servant—Assumed Risk—Ordinary Risks.**

6.  The servant assumes all the ordinary risks incidental to the employment in so far as known to him at the time of his employment, or could have been readily discovered by reasonable and ordinary care, without regard to whether or not those risks were created by the negligence of the master.

**Master and Servant—Assumed Risk—Dangers not Obvious.**

7.  The servant does not assume the risk of dangers which are not obvious or are latent, or not readily discernible by the exercise of ordinary care on his part.

**Master and Servant—Assumed Risk—Subsequent Conditions.**

8.  Servant does not assume risk arising from subsequent operation or unforeseen negligence of the master.

> [As to assumption of risk on failure of employer to perform statutory duty, see note in Ann. Cas. 1913C, 310.]

**Master and Servant—Assumption of Risk—Fellow-servant's Concurrent Negligence With Master.**

9.  Servant does not assume the risk of injury by reason of negligence of a fellow-servant, where such negligence concurs with the negligence of the master to such an extent that but for such concurrent negligence the injury would not have happened.

**Master and Servant—Assumption of Risk—Appreciation of Danger by Servant.**

10.  The mere fact that the servant observed the physical conditions existing at the time of his employment does not of itself imply an assumption of risks of such conditions unless they were so obvious as

to impress their danger upon the mind of a person of ordinary care and prudence.

**Master and Servant—Assumption of Risk—Protective Appliances.**

11. Employee loading wheat sacks in hold of ship was not required to make a special inspection to see whether appliances to protect him from fall of sacks from chute were in place, having the right to presume that employer performed duty of installing such appliances, unless employer's failure to provide protective appliances was so obvious as to be discoverable without special investigation.

**Master and Servant—Employee's Action for Injuries—Instruction on Fellow-servant Doctrine.**

12. In employee's personal injury action, requested instruction on fellow-servant doctrine making no discrimination in the grade of employees was faulty; for such instruction included foremen having power to hire and discharge employees, and who, as to such doctrine, are vice-principals.

**Master and Servant—Fellow-servant Doctrine—"Employee"—"Vice-principal."**

13. In a general sense the "employee" is one who renders service for another for wages or salary, and in this sense a person employed to superintend, with power to employ and discharge men and generally to represent the principal, is an "employee," but such employees, in regard to the fellow-servant doctrine, are "vice-principals."

**Master and Servant—Assumption of Risk—Installation of Safety Appliances.**

14. Employee loading wheat sacks in hold of ship did not assume risk of fall of sack from chute by means of which sacks were being lowered because of failure to install safety appliances, where he had no knowledge that necessary safety appliances were available.

**Master and Servant—Negligence of Fellow-servant—Safe Place to Work—Safety Appliances.**

15. Employee loading wheat sacks in hold of ship, injured by falling of sack from a chute, could recover from employer for injuries resulting from failure to provide safe appliances, notwithstanding that such failure was due to negligence of fellow-servant.

**Appeal and Error—Harmless Error—Instruction.**

16. The giving of an instruction that is so broad as to be doubtful was harmless, where it was in favor of appellant's contention.

From Multnomah: ROBERT G. MORROW, Judge.

Department 2.

This is an action to recover damages for personal injuries sustained by plaintiff while employed in loading grain in the hold of defendant's steam-

ship, "Colusa," at Portland, Oregon. The complaint charged substantially the following negligent acts on the part of the defendant:

"1st.  In not keeping the ship equipped with proper, safe and secure apparatus for handling grain.

"2d.  In allowing the sack of wheat to fall from the sliding-board to the bottom of the hold.

"3d.  In failing to keep a net or apparatus to prevent sacks from falling into the hold of the ship.

"4th.  In failing to provide proper and safe means for raising the chute when it was necessary to raise the receiving table.

"5th.  In failing to provide a safe and proper means of raising the receiving table.

"6th.  In sending the sacks of wheat from the conveyor down the tongue chute with too great rapidity and force.

"7th.  In failing to prevent more than one sack from coming from the conveyor and down the chute at a time.

"8th.  In not furnishing a proper and safe conveyor.

"9th.  In not furnishing a safe and proper place for plaintiff to work.

"10th.  In negligently operating the chute from the head of the conveyor to the table."

Defendant answered and, after denying negligence, set up the following affirmative defenses:

"1st.  Assumption of risk, alleging that plaintiff's injury was due to one of the ordinary risks incident to plaintiff's employment.

"2d.  Negligence of fellow-servant, alleging that any negligence, other than plaintiff's, causing plaintiff's injury was the negligence of a fellow-servant of the plaintiff.

"3d.  Contributory negligence, alleging that plaintiff failed to use proper care in the manner in which he did his work; that he failed to

give any signal prior to raising the re-
ceiving table; and that he failed to observe
whether or not wheat was being sent down
the chutes when raising the table."

All affirmative defenses were denied in the reply.

Plaintiff's testimony tended to show: That the ship
is a large vessel, probably 300 to 400 feet long, on
which are two decks, the upper or main deck and a
lower deck.  Surrounding the upper or main deck is
the ship's rail, which stands several feet above the
main deck.  The main deck is about 12 feet above the
lower deck, and the lower deck is about 12 feet from
the hold where the wheat was being packed for ship-
ment.  The hold of the ship consists of practically all
of the ship below the lower deck and is divided into
compartments, entrance into which is gained by way
of hatchways, or openings, extending downward
through the different decks.  Around the hatchways
or openings are fails, built up solidly two or three
feet, and are designated "coamings."  The hatches
are numbered and plaintiff was working in hatch No.
3.  The hatchways for this hatch are about 16 feet
in width crosswise of the ship, by about 18 feet
lengthwise of the ship; that the docks where the wheat
was stored ready to be taken on board the ship are
double docks, consisting of two floors known as the
"upper dock" and the "lower dock."  These docks are
approximately 15 to 20 feet apart, one above the other,
and the ship was so situated that the upper dock was
some distance above the rail of the ship, and the lower
dock was several feet below the rail; that wheat was
taken on board ship from both these docks, from the
upper dock by a chute running from the edge of the
upper dock down to the rail of the ship, from there
to the hatch coaming by a rail chute, and by means of

continued chutes down into the hold; from the lower
dock by a conveyor, running from the lower dock to
the rail of the ship and from there by other chutes to
the hatch coaming on the main deck and into the hold
similar to those in use from the upper deck.   The con-
veyor consisted of an endless rubber belt, on which
were slats or cleats crosswise of the same, at regular
intervals, operated by an electric motor.   Sacks of
wheat were placed on the conveyor and elevated to
the rail of the ship where they dropped into the rail
chute leading to the hatch.   Wheat coming from the
upper and lower dock was sent down separate sets of
chutes and each set of chutes was served and tended
by a separate and distinct gang of workmen; that each
set of chutes consisted of a rail chute running from
the rail of the ship to the coaming of the hatch on the
main deck, one to the forward coaming of the hatch
opening, and one to the rear where there was a sliding-
board, and two chutes from the sliding-board to re-
ceiving tables in the bottom of the hold.   The rail
chute was in two parts, the first part of which, about
8 or 10 feet in length, was placed at a steeper pitch
than the balance of the chute in order to give the sacks
greater speed.   This first part of the rail chute was
sometimes called the "tongue chute."   The chutes
employed were about 16 or 18 inches wide with 2x4's
along the sides for rails, making shallow chutes or
troughs in which the sacks slid.   The sliding-board
is a plain smooth plank, one being located at each end
of the hatchway, immediately under the chutes, upon
which the sacks of wheat land and are directed or
turned by an operator into one or the other of the pair
of chutes located at his end of the hatch, landing on
to the receiving table in the hold of the vessel.   The
receiving tables consisted of planks about 16 or 18

inches in width and from 10 to 12 feet in length, placed
upon sacks of wheat piled up under the hatch to the
height of the shoulder to avoid the necessity of pick-
ing up or raising the sacks when carrying them to the
different parts of the hold; that one set of chutes ran
from the forward hatch coaming on the main deck
downward into the after part of the hatch to the hold,
and the other set ran from the after hatch coaming
downward into the forward part of the hatch to the
hold.    The lower, or double chutes of the two sets,
crossed at a point about on a level with the ''between-
decks,'' one chute leading forward and one leading
aft to the hold of the ship; that the work was prose-
cuted under the superintendence of P. D. Hall, who
was known as the ''supercargo'' and had full charge
of the ship at the time of loading the wheat, and all
people on the ship were subject to his command and
direction.    He was the defendant's representative and
had full charge of its affairs in the loading of the ship.
Under him, as an assistant and known as a ''boss
stevedore,'' was Charles Warner, who had four fore-
men working under him, including plaintiff's foreman.
Under order from Hall, Mr. Warner hired his fore-
men, who, in turn, hired the men of their particular
gangs.    Each foreman had control of his particular
gang and was invested with power to hire and dis-
charge the men under him.    The men performed their
work under orders and directions from their respec-
tive foremen.    Each gang worked independently of
the other gang and neither the men nor the foreman
of one gang had any authority over the men or fore-
man of the other gang; that Chris Landsberg and
Charles Mackstrom were the foremen in charge of the
two gangs working in hatch No. 3 where the plain-

tiff was employed. Mr. Landsberg's gang, including plaintiff, was handling the wheat that came from the upper deck and their equipment was rigged "from fore to aft" so that plaintiff and his gang were packing the sacks of wheat in the after part of the hold, and the other gang, working under Mackstrom, packed the forward part of the hold and handled the wheat from the lower dock, which was taken on board by means of the conveyor; that respondent's duties consisted chiefly in carrying and packing the sacks of wheat in the hold. The sacks weighed from 130 to 150 pounds each, and were packed in layers over the entire hold. Thus, after several layers of sacks had been packed, it became necessary to raise the receiving tables in order to keep them at shoulder height. This was done by holding up the planks which formed the table and piling under them wheat bags until proper height, and then replacing the plank. This became necessary several times as the work progressed; that the gang in which plaintiff was working had its chutes placed and was at work packing wheat from 15 minutes to half an hour before the other gang had its equipment installed. The chutes and equipment installed by the other gang were placed in such a manner as to leave open spaces from the main deck to the bottom of the hold of sufficient dimensions to allow a sack of wheat to fall clear from the main deck, or from any point along the chutes or other apparatus to the bottom of the hold. These open spaces were not obstructed or guarded in any manner; that after several layers of sacks had been packed in the hold where plaintiff was working, it became necessary to raise the receiving tables and in order to do so it was first necessary to raise the chutes leading to and resting on the receiving table. Plaintiff, in performance of

his duties, and after giving the usual signal, took hold of one of the chutes, raised it over his head the usual and ordinary way, and was holding it, while others were lifting the table and placing additional sacks under it. While in that position with the chute over his head, a sack of wheat weighing from 130 to 150 pounds fell from the rail chute, or sliding-board of the other gang, down upon the chute plaintiff was holding and drove it down upon his head, shoulders, neck and arms, knocking him down, rendering him unconscious and injuring him severely and permanently; and that the falling of the sack, by which plaintiff was struck and injured was due to the manner in which the conveyor was operated. A number of sacks dropped from the end of the conveyor upon the tongue chute and from there to the sliding-board of the opposite gang in such rapid succession that they piled up at the bottom of the rail chute and on the sliding-board faster than the sliding-board operator could handle them and it was impossible for him to control or guide this sack which fell. There was also testimony that there should have been a man at the tongue chute to help the sliding-board man, and that it was the foreman's business to see that a man was there, but that no one was there.

Defendant introduced testimony tending to show that the loading was carried on in the usual manner, and that it had available for use nets, to be used to prevent sacks of wheat from falling into the hold, and claimed that it was plaintiff's duty to see them installed. The testimony on this point was contradictory, although it was shown that such appliances were used after the accident, but there was no evidence that plaintiff knew such nets were on the ship or available for use.

On cross-examination of plaintiff the following testimony was elicited:

"Q. Have you frequently worked under the same conditions in stowing wheat in holds?

"A. Not so very frequently. Quite a number of times with two gangs in one hold, but not exactly the same conditions we had there.

"Q. Not under the same conditions?

"A. Not exactly the same conditions in the way of protection that we had there.

"Q. What difference in the way of protection.

"A. As a general thing there was some net, or some boards or something. Some net underneath the sliding-board, or some boards across the hatch that we used where there is two gangs in one hatch. That is the only difference I can see."

Defendant offered evidence tending to show that it was not customary, in loading vessels with grain, to use nets or boards to protect employees from the danger of falling sacks. This testimony was excluded and its exclusion is assigned as error.

The court's refusal to give the following instructions is also assigned as error:

(a) "I instruct you that all of the employees of defendant engaged in loading wheat on board the S. S. 'Colusa' at the times alleged in the complaint, while engaged in the common purpose and employment of loading wheat on board the said steamship, were fellow-servants, and for the negligence of any of these employees who were fellow-servants of the plaintiff, causing the injuries complained of, plaintiff cannot recover."

(b) "I instruct you that while engaged in the occupation of loading wheat on the S. S. 'Colusa,' at the times alleged in the complaint, all foremen, whether known as straw bosses and in charge of the separate gangs, or the foreman having charge of the whole work of stowing wheat, were, while engaged in that purpose

or object, fellow-servants of the plaintiff, and that plaintiff is not entitled to recover for any act or omission of a fellow-servant which occurred in the course of loading wheat on said ship.''

(c) ''I further instruct you that plaintiff cannot recover by reason of the absence of nets or planks thrown across the hatch opening unless the defendant failed and refused to furnish such nets or planks upon request of the men there working.''

(d) ''I further charge you that if the men working in the hold of the ship or the men on deck using and placing the apparatus furnished by the defendant, were careless or negligent in using or placing said apparatus, for the consequences of such negligence defendant is not liable.''

(e) ''Ship owners and others employing labor on or about vessels are bound to furnish reasonably safe appliances and places for work. But the master is not liable for an injury arising from negligence in a mere detail of the work which is temporary in its nature; nor is he liable where he has furnished suitable materials and appliances which are not used, or improperly used. Where the use of certain appliances is neither customary nor practical, negligence cannot be predicated upon a failure to furnish them by the master.''

The defendant also assigns as error the giving of the following instructions:

(f) ''I instruct you that under the law, the master, who is the defendant in this action, is required to furnish a reasonably safe place for his employees to work, and not only a reasonably safe place to work, but also reasonably modern and safe appliances, tools and machinery with which to carry on the business in which they are engaged, and it is his further duty to keep and maintain them in that condition while the employees are engaged in his service.''

(g) ''I further instruct you that this duty of the master cannot be delegated to any other person so as

to avoid responsibility, and in case the business of the master should be in charge, or under the care or supervision of any other person for him, the same responsibility would attach to the master as though he were personally present and in charge of the work.''

(h) ''And it is not enough that the master shall furnish the employees with a reasonably safe place in which, and reasonably safe appliances, tools and machinery with which, to work, but he is further charged with the duty of seeing that the place in which, and the tools, appliances and machinery with which to work are kept and maintained in a reasonably safe condition, and I charge you that the employee or servant has a right to presume that the master or employer has performed these duties.''

(i) ''You are therefore instructed that if you believe from the evidence that the defendant failed to furnish the plaintiff a safe place in which, or safe appliances, tools and machinery with which to work, or that the defendant failed to maintain them in that condition and that plaintiff was injured thereby, he is entitled to recover damages from the defendant, *even though the failure to perform those duties was due to the negligence of one of plaintiff's fellow-servants, for, as you have been instructed, the defendant could not escape liability by delegating such duties to such fellow-servant* of the plaintiff. Furthermore, the plaintiff has a right to assume that the defendant had performed its duties relative to providing a safe place and safe appliances.''

(j) ''I instruct you that all persons who are engaged in sending wheat down the chute and turning it and packing it were fellow-servants, and the negligence of any one of them resulting in injury to the plaintiff is a complete and perfect defense to the master.''

There was a verdict and judgment for plaintiff and defendant appeals.        AFFIRMED.

For appellant there was a brief over the names of *Mr. Jesse Stearns* and *Mr. John H. Hall,* with an oral argument by *Mr. Stearns.*

For respondent there was a brief and an oral argument by *Mr. Cicero M. Idleman.*

McBRIDE, C. J.—1. The principal objection here is as to the court's action in sustaining an objection to testimony offered by defendant, that it was not usual or ordinary practice to use nets or hatch covers to safeguard employees working in the hold of a ship. We do not see how this was material, in view of the testimony which shows conclusively that the nets, if they were on board the ship, were not placed in position, and that the hatch covers, or other devices, were not placed in a position to protect plaintiff, and if they had been so placed the accident could not have happened.

Evidence of what is customary in the way of protective appliances is frequently admitted as tending to indicate whether or not the employer used reasonable diligence in that regard, but the fact that other employers in the same business are accustomed to omit or dispense with necessary and obvious safeguards, does not tend to prove the exercise of ordinary care or diligence by the defendant. In other words, a custom which habitually disregards the safety of employees, no matter how long continued or how general, can never ripen into reasonable care: *Hamilton* v. *Des Moines Val. R. Co.,* 36 Iowa, 31, 38; *Austin* v. *Chicago etc. R. Co.,* 93 Iowa, 236 (61 N. W. 849); *Douglas* v. *Chicago etc. R. R. Co.,* 100 Wis. 405 (76 N. W. 356, 69 Am. St. Rep. 930).

2-4. In view of the fact that protective apparatus was obviously necessary and would have lessened the liability to accident, and that such apparatus was at hand and available to defendant, we are not disposed to hold that the custom of other employers, in the same business to neglect to use similar precautions, is any evidence tending to absolve defendant from the imputation of negligence in this particular. While it may be true that it was customary for the longshoremen to arrange the apparatus furnished for loading the grain, it does not follow that this includes the duty of searching for and applying apparatus which will render that labor more secure. That it is the duty of the master to use reasonable care to furnish safe appliances for performing the work and a safe place in which to work, requires no citation of authorities. That this duty is nondelegable is also well established.

5. This is not a case where plaintiff, or his fellow-workmen, were furnished with protective appliances and failed to use them. Indeed it is not shown that when plaintiff went to work the same occasion for their use existed that arose when another gang was put to work on the lower deck. With a single gang there was little or no danger of accident, but the evidence shows that some time after plaintiff's gang had gone to work, a second gang was put to work loading from another deck, but using the same hatchway to convey the wheat into the hold. The danger was greatly increased, if not absolutely created, by the addition of the second gang of men after plaintiff had gone to work. Under the circumstances we think the negligence of defendant in failing to provide and have installed the necessary safety appliances and their responsibility therefor is fully established, unless plaintiff can be said to have assumed the hazard of the

situation, which proposition we will now proceed to discuss.

6–10. This action is not brought under our Employers' Liability Statute (Laws 1911, p. 16), but is at common law and must be so considered. The rule of assumption of risk with its exceptions and modifications may be stated as follows:

1. The servant assumes all the ordinary risks incidental to the employment in so far as those risks are known to him at the time of his employment, or could have been readily discovered by the exercise of reasonable and ordinary care for his own safety, without regard to whether or not those risks were created by the negligence of the master.

2. The servant does not assume the risk of dangers, which are not obvious, or are latent, or not readily discernible, by the exercise of ordinary care on his part.

3. He does not assume the risks arising from subsequent, special, or unforeseen negligence of the master.

4. He does not assume risks of temporary conditions, which are unusual and extraordinary, when these conditions arose after his employment and he is without knowledge of them, or they are not obvious to a person exercising ordinary care.

5. He does not assume the risk of injury, by reason of the negligence of a fellow-servant where such negligence concurs with the negligence of the master, to such an extent that but for such concurrent negligence the injury would not have happened.

6. The mere fact that the servant observed the physical conditions existing at the time of his employment, does not of itself imply an assumption of the risks of such conditions unless they were so obvious as to impress their danger upon the mind of a person of ordinary care and prudence. An employee must

not only be aware of the conditions but must understand and appreciate the risk.

In view of these fundamental rules, let us consider the testimony. The conditions were unusual in that this was what the witnesses call a "hurry-up job"; that is, one requiring more than usual haste to complete it. It was also out of the ordinary from the fact that two gangs of men were loading through the same hatchway. It is also different from the ordinary case in that conditions were changed by putting an additional gang to work upon the lower deck after plaintiff had gone to work, and, as shown by the uncontradicted testimony of Schroeder, a witness for plaintiff, the injury was occasioned by the falling of a sack of grain sent aboard by the conveyor to the chute operated by the latter gang.

It may be said in passing that the unusual conditions above described were not embraced in defendant's rejected proffer of evidence, as to the custom in regard to the use of safety appliances. The offer was as follows:

"Witness, if allowed to answer, would testify that it was not the usual or ordinary custom or practice in grain shipping circles, to use nets when loading over or across hatch openings to prevent wheat sacks from falling into the hold while being loaded; and witness, if permitted to answer, would testify that there were at hand a sufficient amount of hatch covers that might have been used by the employees, including the plaintiff, had they so desired, for the purpose of preventing wheat sacks from falling on the sliding-board or from the chute into the hold and that the strongbacks in the between-decks hatch openings, were placed and the covers were there on the between-deck hatch in 12 foot lengths, ready for placing over the hatchway of the between-decks in one or more sections."

There was a further offer to show that the use of the hatch coverings, for the purpose of preventing sacks from falling into the hold, was not customary among shippers or loaders of grain.

It will be observed that both these offers had reference to usual conditions and did not include the three unusual factors in the instant case, to which we have heretofore called attention.

11. To return to the question of assumed risk it will be noted that the risks in the present case were not the ordinary risks, but embraced other and extraordinary hazards. There is no evidence tending to show that plaintiff's attention was ever called to the absence of protective appliances. He was not bound to make a special inspection to see whether they were there or in place. It was the master's duty to make the place, where plaintiff was put to work, reasonably safe and plaintiff had a right to rely upon the presumption that such duty had been performed, unless the failure to perform it was so obvious that a reasonably careful and observant man would have discovered that fact without special investigation.

We all know the hold of a ship is not a place of "sweetness and light," and that the surroundings are not usually conducive to the perception of things by casual observation. Plaintiff was there to stow cargo not to investigate conditions, and there is nothing to indicate that, in the position where he was placed and the necessity he was under of performing rapid and efficient work, his attention would have been directed to the absence of necessary protective apparatus.

It will also be observed that the accident occurred by reason of a change of conditions which arose after he began his employment. The hazard was increased by reason of another gang being put to work at the

same hatchway while plaintiff was below and engaged in his labor. He had a right to assume that the employer had provided against this new hazard by proper precautions, and was not bound to quit his work to make inquiries on that subject.

While, theoretically, a laborer is a free agent, at liberty to examine and guard against danger occurring, or liable to occur, in the course of his employment, and to demand requisite protection, or quit the employment or take the consequences of remaining, it is common knowledge that such a theory is to a great extent impracticable in the present busy crowded age. His freedom to select his employment is abridged by the constantly increasing numbers who must work or go hungry, and his risks are increased by the immense pressure of a tremendous commerce and the complicated methods of handling it. Under the pressure of competition for employment and the necessity of maintaining his place as a satisfactory laborer, he has little time for observing his surroundings, or taking or even demanding of his employer, those precautions for his safety which a human regard for his welfare ought to be furnished without demand.

These and like considerations have, no doubt, had their influence with the most enlightened and progressive jurists, in declaring much less stringent rules in regard to assumption of risk, than prevailed in the earlier history of jurisprudence where competition in labor was less strenuous and the duty of protecting the laborer was less clearly recognized by the courts. An enlightened public sentiment has brought about the enactment of Employers' Liability Statutes and, while they have not been extended to cover cases like the present, the common law has been gradually expanded by judicial decisions until the doctrine of assumption

of risk has been placed upon a reasonably fair basis, which only applies it to those cases where the laborer is held to have assumed those hazards which he would naturally observe and realize in the course of his employment, permitting him to assume that all other risks had been reasonably provided against by his employers.

12, 13. We will now consider the alleged errors in respect to instructions. Request (a) is faulty in that it makes no discrimination in the grade of employees. In a general sense an ''employee'' is one who renders service for another for wages or salary, and in this sense a person employed to superintend the work with power to employ and discharge hands and generally to represent the principal, is an employee. While it has been held by some courts that certain classes of persons acting as vice-principals are not employees within the meaning of the lien and bankruptcy statutes, yet it has never been held that such persons were not employees within the meaning of the term as here applied. The requested instruction would include the foremen in charge of the work here, who had power to hire and discharge laborers and who, under rules too well established to require the citation of authorities, are vice-principals.

14. Requests (b), (c) and (d) do not state the law as applicable to the case at bar. The plaintiff had a right to assume that reasonable precautions for his safety had been taken and act upon that assumption. The requests ignore these important factors in the problem. First, they do not require the important factor, that before plaintiff should be held to have assumed the risk, he should have known or by the exercise of ordinary diligence, might have known that it existed. They ignore the factor that before the plain-

tiff could be held to have assumed the risk, he should also have known the necessary safety appliances were available. They ignore the fact that it was not only the duty of defendant to have the appliances on hand and available, but to see that they were properly placed.

15. Request (c) is subject to the same criticism and also to the further objection that there is no evidence that the use of safety appliances was not practical, but on the contrary such evidence as there was on this subject indicates that such use was practical.

16. Instructions (f), (g), (h) and (i) given by the court are correct statements of the law as applied to this case, and we approve them.

Instruction (g) is so exceedingly broad as to be doubtful, but it is in favor of defendant's contention and could therefore work it no injury.

We find no prejudicial error in the record. The verdict was for a moderate sum and in our opinion was justified by the testimony.

The judgment is therefore affirmed. AFFIRMED.

BEAN, JOHNS and HARRIS, JJ., concur.