Argued February 18, affirmed March 16, rehearing denied April 20, 1915.

# SONNIKSEN *v.* HOOD RIVER GAS & ELECTRIC CO.*

(146 Pac. 980.)

**Master and Servant—Injuries to Servant—Assumption of Risk.**

1. Under the employers' liability law (Laws 1911, p. 16), making it a crime for an employer to originate or continue a hazard that might be prevented, an employee continuing in a hazardous service does not assume the risk of injury; for that would avoid the force of the statute and allow private persons to contract with respect to the commission of crimes.

> [As to assumption of risk under Employers' Liability Act, see note in Ann. Cas. 1915B, 481. As to Federal Employers' Liability Act as superseding common and statutory law on same subject, see note in Ann. Cas. 1915B, 493.]

**Master and Servant—Injuries to Servant—Actions—Jury Question.**

2. Evidence on the questions whether an injured lineman knew of defects or was guilty of negligence in failing to properly insulate electrict wires held, under the evidence, for the jury.

**Negligence—Injuries to Servant—Actions—Contributory Negligence.**

3. Under employers' liability law (Laws 1911, p. 18), Section 6, providing that the contributory negligence of the person injured shall not be a defense, but may be taken into account by the jury in fixing the amount of the damages, the jury, as a basis for computation, should first discover what sum of money would afford indemnity for the injury, irrespective of the cause of the hurt, and then, if both

---

*The authorities on the question of the constitutionality, application and effect of the Federal Employers' Liability Act are collated in an extensive note in 47 L. R. A. (N. S.) 38.  REPORTER.

employer and employee are guilty of negligence, they must compare the employer's negligence with that of the employee, and from such relative estimate assess the damages.

**Master and Servant—Injuries to Servant—Contributory Negligence—Instructions.**

4.  In a personal injury action by an employee, the court charged that his contributory negligence would not be a defense, but might be taken into account in affixing the amount of the damages; such negligence being considered in mitigation. The court further charged that the employers' liability law made it incumbent on the jury to compare the negligence of both employer and employee, and that, if the employee was negligent, such negligence might be taken into account in mitigation or reduction of damages. *Held,* that the instructions, read together, correctly stated the law that the contributory negligence of the employee, if any, must be compared with that of the employer, and considered in mitigation in assessing damages.

From Hood River: WILLIAM L. BRADSHAW, Judge.

Department 1.   Statement by MR. CHIEF JUSTICE MOORE.

This is an action by C. C. Sonniksen against the Hood River Gas & Electric Company, a corporation, and is based on the employers' liability law, to recover damages for personal injury resulting from a shock of electricity and charged in the complaint to have been caused by the defendant's negligence.   The answer denied the want of care alleged, and averred that the hurt complained of was occasioned by the plaintiff's carelessness.   The reply put in issue the allegations of new matter in the answer, and, the cause having been tried, the plaintiff secured a judgment for $10,000, and the defendant appeals.   AFFIRMED.   REHEARING DENIED.

For appellant there was a brief over the names of *Mr. John A. Laing, Mr. H. W. Strong* and *Mr. George R. Wilber,* with oral arguments by *Mr. Laing* and *Mr. Strong.*

For respondent there was a brief and an oral argument by *Mr. A. J. Derby.*

Opinion by MR. CHIEF JUSTICE MOORE.

It is contended that the testimony shows the plaintiff's injury was caused by his own carelessness, and hence errors were committed in denying a motion for a judgment of nonsuit and in refusing to direct the jury to find for the defendant.  The evidence shows that the defendant is a corporation, and operates at Hood River, Oregon, machinery to generate electricity which is distributed by wires suspended upon poles, and that the current thus produced is used for power and lighting purposes.  A part of the system, extending into the farming country, and carrying 6,600 volts, consists of three primary wires continuing east and west, and supported, at the place of the accident, by a double cross-arm, which is seven feet in length and fastened near the top of the pole.  Four feet lower is another similar cross-arm sustaining two secondary wires.  Two feet below the latter support are two more secondary wires extending north and south, and upheld by another double cross-arm of the same length called a "buck-arm," but placed at a right angle with the others. From each of the two outer wires of the upper group a wire called a "primary lead" extends to a fuse-box or "cut-out," which is immediately below the wire referred to of the upper group, and fastened near an end of the middle cross-arm.  Primary leads extend from two fuse-boxes to a transformer, which is placed on the west side of the pole, and which rests on the top of the buck-arm, but is hung to the middle arm.  The transformer reduces the current carried by the primary wires to the required voltage, which measure is conducted by leads to the secondary wires, and thence distributed to customers for domestic purposes.  Just beneath the buck-arm is the bight of a guy wire that ex-

tends north to a "current breaker," and thence to the soil, where the end of the wire is attached to a grounded anchor. Fastened to the shell of the transformer is an uncovered ground wire, which is looped once around the top of the bight of the guy wire, and thence extends on the south side of the pole to the earth, into which the end of the wire is inserted and properly grounded.

The plaintiff is a lineman and repairer, having had about four years' experience, and been occasionally employed by the defendant. He testified, in effect, that its manager, A. S. Hall, on November 6, 1913, requested him to go to the pole referred to and repair the line; that he went as directed, and climbed the pole before Hall and a helper arrived; that, standing on the buck-arm, he opened the doors of the fuse-boxes, and discovered that each fuse therein had blown out; that, the manager and his assistant having arrived, they tossed up a coil of fuse and a plug puller to the witness, who removed from the cut-outs the plugs, which he connected by fuse with the primary leads and inserted in their respective places; that in doing so the fuse on the south side of the pole again blew out, therby demonstrating that the transformer had been injured by too great a current of electricity; that Hall thereupon informed him it was unnecessary to withdraw from the fuse-box on the north side of the hole the plug to which the uninjured fuse remained attached, saying the transformer could be replaced by another the next day, and directed him to descend; that in obeying the command he took a step downward, placing the iron spur fastened to his right foot into the pole through the loop of the guy wire on the north side, his left foot resting on the buck-arm; that a wire then caught his shirt, and in trying to disengage the entanglement his right arm came in contact with the primary lead which extends from the

north fuse-box to the transformer, thereby completing the circuit, from the effect of which he was so severely shocked and burned as to necessitate the amputation of his right arm near the shoulder and his right leg near the knee.

J. R. Thompson, an electrical engineer, testified, in substance, that it was extremely dangerous to permit a bare ground wire to come in contact with a transformer, or with secondary wires, or with an uncovered guy wire, and that, without such connection, if the pole were perfectly dry, a lineman touching a primary wire might feel a little effect of the electricity, but he would not be seriously harmed.

F. L. Gifford, another electrical engineer, testified, in effect, that a ground wire from a transformer connected with a guy wire, as described herein, was a death trap.

The theory of the defense is that on April 5, 1913, the plaintiff hung the transformer referred to, and in doing so neglected to insert the primary lead on the north side of the pole in rubber hose, and that his elbow coming in contact with such exposed wire was the proximate cause of the injury.

Frank Surrett, a lineman, stated upon oath that on February 12, 1913, he assisted in rebuilding on the pole the Maloney transformer in question, and that the primary leads therefrom were then covered with hose.

The plaintiff, as a witness, admitted that on April 5, 1913, he rehung the transformer and made a written report of the work to the defendant. In referring to such service he testified generally that he took down the transformer and hung another with new primary leads which come therewith, but he could not remember what insulator such wires had, nor could he call to mind that the primary leads on the old transformer were

covered with hose, nor was he able to state that the transformer which was on the pole November 6, 1913, when he was hurt was the one he hung.

A. S. Hall, the defendant's manager, testified that the electric line on which the plaintiff was hurt was put up about December 1, 1912. Referring to the completion of that branch of the system, this witness was asked by defendant's counsel: "How long did that transformer stay on the pole?" He replied:

"It stayed there until early in the spring of 1913. It burned out, due to grounding.

"Q. Was that the transformer that Sonniksen took down from the pole on the 5th of April, 1913?

"A. Yes, sir.

"Q. Do you know whether or not there was any changes or repairs or anything done to the transformer from the date that Sonniksen put it up on the pole until the time of the accident?

"A. I have no knowledge of anything having been done there; in fact, I think there was not.

"Q. If there was, would your records show it?

"A. Yes, sir.

"Q. Why would your records show it?

"A. Because every man going out to work turns in a time-card for the work done, and no one goes out on a job of that kind without my knowledge.

"Q. Is that time-card similar to this time-card introduced in evidence yesterday, made by Sonniksen?

"A. Yes, sir. They always have to be turned in in order to draw pay for the work.

"Q. So you can state from your handling of the men and the records there has been no change in the transformer?

"A. I think not.

"Q. What insulation is provided by you or by the company for the insulation of the leads from the fuse-boxes into the transformer?

"A. The transformer always comes with a manufacturer's lead—that is, a lead put in by the manufactur-

ing company—which in some cases is long enough to reach this fuse-box.   Otherwise it is spliced out with weather-proof wire, and the whole thing covered with hose.

"Q. Rubber hose?

"A. Yes, sir.

"Q. And that provides an insulation?

"A. Yes, sir.

"Q. State whether or not the transformer that Sonniksen hung, and he testified he put those wires there, state whether or not after the accident you discovered anything.

"A. When I went out after the accident to examine the pole, I found that there was a section spliced in this wire to reach the fuse-box, about 8 inches long, that didn't have hose on it.   It had no hose where it was spliced, and there was no hose on the lead.

"Q. He had omitted to put the hose there?

"A. Apparently so."

This witness further testified that the covering used by his principal as an insulator on primary leads was a half-inch garden hose through which the wires from the fuse-boxes to the transformer were inserted.   Referring to the standard set of materials always taken out to make such repairs, he stated that they consisted of the hose, transformer, cut-out boxes. fuse and fuse-holders, and that the plaintiff, having hung several transformers, knew what such standard outfit consisted of.

1. The foregoing is thought to be a fair epitome of the testimony relating to the cause and manner of the injury charged in the complaint.   Based on such evidence, it is argued that, since the plaintiff was an experienced lineman and repairer who knew how to hang transformers, and properly to insulate primary leads, and having been supplied for that purpose with suitable rubber hose which he neglected to use, of which

fact the defendant's agents had no knowledge, that he was hurt in consequence of his own carelessness, and, such being the case, as between him and the company he cannot recover, and the provisions of the employers' liability law have no application herein. The enactment referred to was initiated by petition and ratified by a majority of the votes cast upon the measure at the general election held November 8, 1910: Gen. Laws Or. 1911, c. 3. Prior to such election, the rule invoked by defendant's counsel prevailed in this state: *Brasel* v. *Oregon R. & N. Co.,* 54 Or. 157 (102 Pac. 726). The legal principle announced in that case is a recognition of the ancient doctrine of assumption of risk by an employee who, with knowledge, or by the exercise of reasonable diligence might have known, of the danger to which he is or may be exposed, undertakes or continues in the service, and in consequence of the hazard sustains an injury, cannot maintain an action against the employer for the recovery of the damages suffered. The employers' liability law prescribes the duty demanded of an employer, and provides that upon his conviction for a violation of any of the clauses of the act he shall be punished by fine or imprisonment or both. The enactment having thus declared it to be a crime to originate or continue a hazard that might be prevented, the agreement of the employee to render the service will not be so interpreted as to embrace such risk; for a contrary construction would amount to a recognition of an engagement to transgress the statute, and would be invalid as against the principles under which the freedom of contract or private dealings is restricted by law for the good of the community. For the reason thus given it has been settled by repeated adjudications that the employers' liability law eliminates the doctrine of assumption of risk: *Dorn* v. *Clarke-*

*Woodward Drug Co.,* 65 Or. 516 (133 Pac. 351); *Dunn* v. *Orchard Land Co.,* 68 Or. 97 (136 Pac. 872); *Wasiljeff* v. *Hawley Paper Co.,* 68 Or. 487 (137 Pac. 755); *Schaller* v. *Pacific Face Brick Co.,* 70 Or. 557 (139 Pac. 913); *McClaugherty* v. *Rogue River Electric Co.,* 73 Or. 135 (140 Pac. 64); *McDaniel* v. *Lebanon Lumber Co.,* 71 Or. 15 (140 Pac. 990); *Filkins* v̇. *Portland Co.,* 71 Or. 249 (142 Pac. 578); *Heiser* v. *Shasta Water Co.,* 71 Or. 566 (143 Pac. 917).

2. It may well be doubted if the testimony given by the defendant's witnesses was sufficient even to charge the plaintiff with notice of any defect in the insulation of the primary leads, or that he was responsible for the failure to insert such wires in rubber hose.   It will be remembered that Mr. Hall testified he thought no changes or repairs had been made in or to the transformer after April 5, 1913, and prior to the time of the accident, and that he also thought he could ascertain such facts from the reports handed in by the employees. He is not certain about these matters, and did not offer in evidence any daily time-ticket showing the labor performed in making repairs, or testify that such records were lost or destroyed, or that they embraced a statement of all the changes or alterations that had been made during the intervening time.   The testimony received was sufficient to authorize a submission of the cause to the jury, and no error was committed as alleged.

3, 4. It is maintained that an error was committed in giving the following instructions:

"The contributing negligence of the plaintiff, if you should find him negligent, would not be a defense under the law, but it may be taken into account by you in fixing the amount of the damage.   In other words, if you find that the defendant violated its duty; and be-

76 Or.—3

cause of the violation of its duty plaintiff sustained an injury, then the defendant would not have the right to say that the contributory negligence of the plaintiff, if plaintiff was guilty of contributory negligence, could serve it as an absolute defense, and in the event you would have the right only to take into consideration any contributory negligence of the plaintiff for the purpose of mitigating the damages the plaintiff may have sustained.''

The defendant's counsel requested the court to give an instruction practically embodying the language quoted, but using the word ''must'' where ''may'' is employed. The solicited instruction was denied. It contained a sentence that rendered the language employed objectionable. The request will be treated, however, as calling the court's attention to the use of the proper word.

Section 6 of the employers' liability law reads:

''The contributory negligence of the person injured shall not be a defense, but may be taken into account by the jury in fixing the amount of the damage.''

In *Filkins* v. *Portland Lumber Co.*, 71 Or. 249 (142 Pac. 578), in discussing the clause of the statute referred to, it is said:

''Construing Section 6 in connection with the other provisions thereof leads to the conclusion that the enactment makes an injury suffered by an employee, when performing the service for which he was engaged, a loss the damages resulting from which, if sustained while the person so hurt was exercising ordinary care, must be wholly liquidated by the employer; but, if the party injured was not at the time he was hurt exercising that measure of care, a part of such loss must be borne by him, while the remainder of the damages is recoverable from the other party, on the basis of the comparative degree of the fault of each.''

In *Chadwick* v. *Oregon-Washington R. & N. Co.*, 74 Or. 19 (144 Pac. 1165), Mr. Justice Burnett, discussing the subject, observes:

''The defendant sought to have the jury instructed on the question of damages to the effect that, if the plaintiff's negligence was equal to, or exceeded, that of the defendant, they must find for the defendant. The court, however, instructed the jury, in substance, that it was the duty of the jury to diminish or reduce the damages attributable to the defendant's negligence in proportion to the amount of negligence justly chargeable to the plaintiff, and if there should be any difference in favor of the plaintiff, after the damages were reduced to a money value, such difference should be the amount of their verdict. The instruction of the court was, in substance, a compliance with the federal statute on that subject, which requires that in case of, contributory negligence it shall not be a defense, 'but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.' Thus it will be seen that under that statute it is not a question of majority of negligence, but rather one of proportion. Any negligence of the defendant working injury to the plaintiff would therefore entail some damages. For illustration, let us suppose that both parties were equally negligent in the estimation of the jury, and that the actual damages of the defendant were properly assessable at $2,000. In such a case the verdict should be for the plaintiff in the sum of $1,000, for the reason that his negligence is one half of the sum total of all the negligence of both parties.''

In an action under the employers' liability law, to recover damages for a personal injury, the jury as a basis for computation should first determine what sum of money would afford indemnity for the loss sustained, irrespective of the cause of hurt, and, if they find the employee was free from negligence at that time, and the defendant was guilty thereof, their verdict

should be in favor of the plaintiff for such sum. If, however, the employer and the employee were each negligent at the time of the injury, as found by the jury, they must compare the employer's negligence with that of the employee, and from such relative estimate determine the percentage of negligence properly chargeable to the employer, and such percentage, when ascertained in this manner, constitutes the proper part of the damages to which the plaintiff is entitled, and the verdict must be in his favor for such part or percentage of the sum agreed upon by the jury as indemnity for the loss sustained. If the jury concluded the employer was not negligent when the injury was received, their verdict should be in favor of the defendant.

Though the clause of the act under consideration uses the word "may," the jury must apportion the damages occasioned by a loss suffered by an injury to an employee when he and the employer have both been negligent in the manner indicated. Though the instruction complained of is subject to criticism, on the ground that it gave the jury an option whereby they might escape the duty devolving upon them, the language used should be construed with other parts of the charge on the same subject: *Wellman* v. *Oregon Short Line Ry. Co.,* 21 Or. 531 (28 Pac. 625); *Matlock* v. *Wheeler,* 29 Or. 64 (40 Pac. 5, 43 Pac. 867); *Wadhams* v. *Inman,* 38 Or. 143 (63 Pac. 11).

The court, in referring to Section 6 of the employers' liability law, further instructed the jury as follows:

"This law makes it incumbent upon you to compare the negligence, if you find both parties guilty of negligence contributing to or bringing about plaintiff's injury. If, therefore, you find that the defendant has been negligent in some manner as charged in the complaint and that such negligence contributed to plain-

tiff's injury, and you also find that plaintiff was guilty of negligence contributing to his own injury—and I have defined to you what facts would constitute such negligence—the negligence on the part of the plaintiff may be taken into account by you in mitigation or reduction of the damages that you might otherwise find for plaintiff.''

It is believed that the use of the word ''incumbent'' in the part of the charge which stated to the jury, ''The law makes it incumbent upon you to compare the negligence, if you find both parties guilty of negligence contributing to or bringing about plaintiff's injury,'' corrects any inference that might have arisen by the employment of the word ''may'' instead of ''must.'' The instruction complained of was not contradictory, and the duty required of the jury was lacking only in degree.

It must be assumed that the jurors who tried this cause were intelligent men who fully understood the meaning of the English language and were able to comprehend the entire charge; and, since each juror signed the verdict when a less number, under our statute, might have determined the issues involved, we consider they were not misled by the instruction complained of, when viewed in connection with the entire charge, and that no error was committed as alleged.

Other errors are assigned, but they are deemed immaterial.

It follows that the judgment should be affirmed, and it is so ordered.     AFFIRMED.     REHEARING DENIED.

Mr. Justice McBride and Mr. Justice Benson concur.

Mr. Justice Burnett dissenting.