Argued September 6, 1960, reargued January 11, reversed and
remanded January 25, 1961

# RITTER *v.* BEALS ET AL

358 P. 2d 1080

506

*Philip A. Levin,* Portland, argued the cause for appellant and cross-respondent. On the appellant's brief were Peterson, Pozzi & Lent, and on the reply brief were Pozzi & Wilson, Portland.

*Bruce Spaulding,* Portland, argued the cause for respondents and cross-appellants. On the brief were Mautz, Souther, Spaulding, Kinsey & Williamson, and James H. Bruce, Portland.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

GOODWIN, J.

This is an appeal by the plaintiff, Carrie Ritter, from a judgment n.o.v. in favor of the defendants in an action for damages resulting from an accident. The defendants have cross-appealed, assigning error to certain rulings made during the trial.

The jury having found for the plaintiff, it is necessary first to review the record in order to determine whether the court erred in entering judgment n.o.v.

Mrs. Ritter was injured on May 27, 1956, while in the course of her employment as a practical nurse and housekeeper for the defendant Beals, who was an 84-year-old invalid confined to a wheel chair.

In 1954, Beals conveyed all his property, including his home, in trust to the trustees of the Tillamook County Young Men's Christian Association. Except for Beals, the other named defendants are trustees under the trust instrument, which was received in evidence. The trust requires the trustees to manage the property and to provide for the needs of Beals for life with the remainder to go to the objects of the trust.

At the time of her employment, Mrs. Ritter was interviewed by Beals and was selected by him for the job. The defendant trustees paid her salary and participated to a limited extent in supervising her work. The defendant Kaliher, one of the trustees, was also the personal physician of the defendant Beals and later of Mrs. Ritter.

Dr. Kaliher, acting either in his capacity as a physician or as a trustee, the evidence does not distinguish

which, told Mrs. Ritter to try to get Beals outside for fresh air and sunshine if she could. This was a difficult task for Mrs. Ritter, who, according to the evidence, was 67 years of age, obese, and was under treatment for diabetes. Beals weighed about 185 pounds. He was unable to walk. Accordingly, Mrs. Ritter suggested to the trustees that a ramp be built in order that Beals could be moved conveniently by wheelchair from the house to the sidewalk.

The ramp was built by the defendant Gardner, who ordered the materials and had them paid for from the trust funds. He was assisted to some small degree by a carpenter who was not made a party. Gardner is the secretary of the trustees. There is no evidence that Beals personally supervised the building of the ramp. Neither is there evidence that Mrs. Ritter supervised the construction. There is no doubt that the ramp was built for the benefit of Beals by one of the trustees in the exercise of the obligations of the trust.

When completed, the ramp consisted of board decking nailed to a frame fourteen feet long running from the top of the back steps to the ground. The top step was three feet above the ground. The ramp had a grade of about 4.6 feet of horizontal run for each foot of fall.

Mrs. Ritter testified that when the ramp was finished she was afraid to wheel her patient down the ramp because she thought it was too steep. She said that she wanted to test it before subjecting Beals to what she thought was an unsafe condition. The defendant Gardner, who was present when Mrs. Ritter expressed her reservations concerning the ramp, volunteered to act as a test passenger in the wheel chair. After Gardner got into the chair, the plaintiff turned it around in order to back down the ramp with it as

she had been taught to do some years earlier in her nurse's training. After taking only a step or two, she lost control of the wheelchair and of her footing and fell off the ramp, sustaining the injuries which gave rise to this action. Gardner was able to avoid falling by grasping the end of a handrail on the back porch stairs, but there was no handrail on the ramp.

The complaint charged the defendants, and each of them, with negligence in certain particulars:

(1) Failure to provide a safe place to work, and specifically failure to provide hand or guard rails;

(2) Failure to employ sufficient workmen to assist the plaintiff; and

(3) Failure to make the ramp long enough for a gradual ascent or descent.

The defendants denied negligence, and alleged three affirmative defenses: that the plaintiff herself was contributorily negligent; that Mrs. Ritter assumed the risk of the obvious and known hazards in using the ramp; and that the construction of the ramp was her own idea and that the ramp was built under her direction and control. The reply was a general denial.

■ On the issues thus made up, the cause proceeded to trial. Mrs. Ritter offered evidence tending to support here theory of the case. The defendants sought to prove their theory of the case by testimony from the plaintiff's witnesses. The defendants put on no additional testimony. There was ample evidence to support the jury's finding that the ramp was unsafe.

In view of the evidence that the ramp was unsafe, the jury was justified in finding that some, if not all, of the defendants were negligent.

The defendants urge in support of their judgment n.o.v. that even if they were negligent, as the jury found that they were, Mrs. Ritter is barred both by

her own contributory negligence as a matter of law and by voluntary assumption of risk as a matter of law. The third separate defense was unsupported by any evidence and appears to have been abandoned.

■ Contributory negligence in the particulars alleged in the answer was submitted to the jury in accordance with the defendants' theory of the case. The jury found for the plaintiff. There was a jury question. The verdict settles the matter. It was error to set aside the verdict and enter judgment n.o.v. on any basis of contributory negligence as a matter of law.

The defense of assumption of risk is pleaded in these words: "* * * all of the risks and hazards incumbent upon said employment and particularly the use of said wheel chair on said ramp were obvious and known to plaintiff and she assumed all of the risks thereof."

The evidence shows that Mrs. Ritter was aware of the possibility of danger to Mr. Beals in the use of the ramp. She testified that she did not want to take her patient down the ramp because she thought it was too steep. She refused to subject Mr. Beals to the risk that the wheel chair might get away from her. She requested an opportunity to test the ramp first with a less fragile passenger in the wheel chair. All of this evidence was evidence from which the jury could have found that Mrs. Ritter knowingly assumed a risk of injury either to (a) the passenger in the wheel chair, or to (b) herself, if the defense was available.

The jury was instructed that Mrs. Ritter could not recover if she voluntarily assumed the known and appreciated risks of using the ramp, or if she proceeded to use the device when she should have known, in the exercise of reasonable care, of the risks involved in

such use, notwithstanding the negligence, if any, of the defendants.

The jury having found against the defendants after receiving the instruction summarized above, the question of assumption of risk is closed unless the defendants are correct in their contention that Mrs. Ritter assumed the risk as a matter of law.

■ The trial court, in entering judgment n.o.v., merely observed that it should have directed a verdict. The evidence, however, fails to bear out the theory that Mrs. Ritter assumed any risk as a matter of law. There is evidence that Mrs. Ritter was afraid her patient might be hurt. Any circumstantial evidence that she appreciated any peril to herself, or that, in the exercise of reasonable care, she should have appreciated any such danger, would be relevant in connection with a jury question of contributory negligence as will appear below.

■■ The fact that Mrs. Ritter expressed doubt about the safety of the ramp and wanted to test it before subjecting her patient to what she thought might be a hazard is evidence of doubt, not evidence of knowledge. *Millen v. Pacific Bridge Co.*, 51 Or 538, 553, 95 P 196. Certainly, the court cannot say as a matter of law that Mrs. Ritter assumed a known and obvious risk of danger to herself. The jury having found otherwise, the verdict should not have been set aside upon the ground that she placed herself in a position of danger as a matter of law. *Celorie v. Roberts Bros., Inc.*, 202 Or 671, 683, 276 P2d 416.

This court "looked with disfavor upon the defense of assumption of the risk" in *Celorie v. Roberts Bros., Inc.*, at 682, and quoted, with reference to risks in-

herent in the employment, the following from an earlier case:

> "The mere fact that the servant observed the physical conditions existing at the time of his employment, does not of itself imply an assumption of the risks of such conditions unless they were so obvious as to impress their danger upon the mind of a person of ordinary care and prudence. An employee must not only be aware of the conditions but must understand and appreciate the risk." McBride, C.J., in *Shields v. W. R. Grace & Co.,* 91 Or 187, 201, 179 P 265.

If it were not for another error which will be discussed below and which requires a new trial, it would be sufficient at this point to dispense with further discussion of assumption of risk and merely reinstate the verdict. But because of the necessity of another trial, and because an exception was taken to the submission to the jury of the separate defense of assumption of risk in the first trial, it is appropriate to consider whether the separate defense was available to the defendants in any event.

As noted above, the defense of contributory negligence is available in cases of this character. *Hillman v. North. Wasco Co. PUD,* 213 Or 264, 323 P2d 664. However, it does not necessarily follow that a separate defense of voluntary assumption of risk may be pleaded when an employe seeks damages for negligence in failing to provide a safe place in which to work.

Before considering whether an Oregon workman may be barred by voluntary assumption of risk in an action based upon the negligence of an employer in a non-hazardous occupation, it is first necessary to discover what kind of assumption of risk is involved.

Part of the difficulty in this case arises out of what Dean Prosser calls the confusion that surrounds the

use of the term "assumption of risk." Prosser, Torts (2d ed, 1955) 303, § 55.

There the writer describes four distinct usages of "assumption of risk" in the law of torts. Harper and James describe "at least two." 2 Harper and James, The Law of Torts 1162, § 21.1.

Oregon cases illustrate the various contexts in which "assumption of risk" has meant different things in different cases. There are two legal relationships in each of which two distinct kinds of conduct have been characterized as assumption of risk.

## I. *Master and Servant*

(a) In the injured-workman cases prior to the enactment of remedial legislation, a workman could not recover if the injury was caused by an ordinary hazard inherent in the employment, provided he had taken the employment with full knowledge and appreciation of the risk thereof. *Tucker v. Northern Terminal Co.,* 41 Or 82, 68 P 426 (1902). Such cases did not involve contributory negligence. The plaintiff was denied recovery, not because of any fault on his part, but because he voluntarily accepted the hazard as a normal condition of his employment. Restatement, 2 Agency 1220, § 521.

(b) A second usage of assumption of risk is also found in master-servant cases prior to modern legislation. In these cases, the court is dealing with fault on the part of the plaintiff which amounts to contributory negligence. Where the fault consists of a voluntary act which places the workman in a position of known danger, beyond the ordinary risks of his employment, the courts call this type of contributory negligence assumption of risk also. *Brundage v. Southern Pac. Co.,* 89 Or 483, 174 P 1139 (1918). Re-

statement, 2 Torts 1230, 1232, § 466 (a), Comment d. This second kind of assumption of risk by a workman may bar recovery only when it amounts to contributory negligence in cases where contributory negligence is a defense.

## II. *Litigation Between Strangers*

Outside the master-and-servant field, in litigation between strangers, "assumption of risk" appears in cases which describe both the situation where the plaintiff is free from fault and the situation where his own contributory negligence was a causal factor.

(a) An example of assumption of risk in which the plaintiff is not at fault is found in *Hunt v. Portland Baseball Club,* 207 Or 337, 296 P2d 495. There the patron of the baseball park was denied recovery, not because he was at fault, but because the defendant was free from fault. There was no duty upon the part of the defendant to refrain from knocking foul balls in the plaintiff's direction. The patron, by implied consent, assumed the risk that a fly ball might soar out of the infield. Similar cases are collected in the opinion.

(b) In a growing body of recent decisions, the language of assumption of risk appears as a convenient but inexact statement of contributory negligence which consists of voluntarily placing oneself in a position of a known and appreciated danger. See Restatement, 2 Torts 1230, § 466 (a). In *Bockman v. Mitchell Bros. Truck Lines,* 213 Or 88, 320, P2d 266, 69 ALR2d 152, McALLISTER, now C. J., reviews earlier Oregon decisions and those from other jurisdictions in which the negligence of the plaintiff in voluntarily choosing a hazardous course of conduct prevented recovery. See Restatement, 2 Torts 1231, § 466 (a), Comment c.

With this somewhat detailed review of assumption

of risk as found in our decisions and as explained by the text-writers, it becomes necessary to inquire whether assumption of risk as a separate defense, apart from contributory negligence, can be submitted to the jury upon another trial of the case at bar.

The type of work Mrs. Ritter was doing is not found within the statutory definitions of hazardous employment in the Workmen's Compensation Act, ORS 656.085. It is not covered by the Employers' Liability Law, ORS 654.305 to 654.335. Therefore, the defense of assumption of risk is not specifically withdrawn by the Workmen's Compensation Act or by cases under the Employers' Liability Law such as *Sonniksen v. Hood River Gas & Elect. Co.,* 76 Or 25, 146 P 980.

Still a third statute bears on the separate defense of assumption of hazards inherent in the employment. Earlier statutes now found in ORS 654.005 to 654.180 are sometimes called the safety act:

> "654.010. Employers to furnish safe place of employment. Every employer shall furnish employment and a place of employment which are safe for employes therein, and shall furnish and use such safety devices and safeguards, and shall adopt and use such practices, means, methods, operations and process as are reasonably adequate to render such employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life and safety of such employes.
>
> "654.015. Unsafe place of employment prohibited. No employer, owner or lessee of any real property in this state shall construct or cause to be constructed or maintained, any place of employment that is not safe."

ORS 654.050 provides a penalty for violations of safety regulations after notice.

The above act was first adopted in its present form in 1920. Its policy, legislative history, and judicial construction were discussed at length in *Hillman v. North. Wasco Co. PUD,* supra, 213 Or at 289 et seq. As noted in the *Hillman* case, the safety act is independent of both the Employers' Liability Law and the Workmen's Compensation Act.

In language equally applicable to the safety act, this court held in *Hill v. Saugested,* 53 Or 178, 189, 98 P 524, that an earlier statute of similar import, with P 524, 22 LRA (ns) 634, that an earlier statute of similar import, with a penalty provision, withdrew the defense of assumption of risk. The court held that the workman and the employer, by their agreement, could not nullify a public law which enjoined a duty upon the employer and provided criminal penalty for a violation of the duty. Oregon Laws 1907, ch 158 (the factory inspection law).

 Plaintiff contends that the safety act applies to domestic help because it uses the words "every employer." Another trial makes it necessary to consider the application of the safety act to domestic employes. *Larson v. Papst,* 205 Or 126, 286 P2d 123, did not apply the safety act, but the case was overruled in part by *Hillman v. North. Wasco Co. PUD,* supra. The question has remained open whether a domestic worker is entitled to rely upon the safety act as may workmen in other employment.

The safety act does not appear to have been written with the intention that it cover domestic help. One section of the act gives the State Industrial Accident Commission "full power and jurisdiction over, and * * * such supervision of, every employment and place of employment in this state as may be necessary adequately to enforce and administer all laws and all

lawful orders requiring such employment and place of employment to be safe, and requiring the protection of the life and safety of every employe in such employment or place of employment." ORS 654.025 (1).

The act provides for the promulgation of safety regulations. ORS 654.025 (2). Still another section provides for annual inspections of places of employment. ORS 654.047.

It must be concluded that domestic help is not within the scope of the safety act. If the legislature had intended to make private homes subject to the regulations and inspections that are provided for in the act, such intent would have been expressed. "Every employer", as used in the act, means every employer who uses employes in a trade or business. See Annotation, 49 ALR2d 317, 324; and see Larson, Workmen's Compensation 735, § 50.00, which discusses the rationale in exempting non-business employment from compensation acts.

■ It does not follow, however, that domestic workers are without protection against the negligence of their employers. At common law, it was generally conceded that employers, including employers of domestic help, must provide a reasonably safe place in which to work. Prosser, Torts (2d ed) 373. And see Annotation, 49 ALR2d 317, supra, with reference to domestic employment.

■ Left to her remedy at common law, the plaintiff is subject to an affirmative defense of contributory negligence if the facts justify the defense. But to permit the employer to allege a further defense of assumption of risk (of hazards created by the employer's negligence) allows him to plead contributory negligence twice. Once is enough.

■ A pleading of an affirmative defense has two

functions. It must inform the plaintiff of facts which the defendant will prove. It must also give the trial court a pleading foundation for the taking of testimony and ultimately for instructing the jury. Everything in the case at bar which the defendants may submit as evidence or upon which the court may instruct the jury in connection with the plaintiff's conduct can be submitted upon a pleading of contributory negligence. Nothing is added to contributory negligence, except confusion, when facts which constitute contributory negligence are pleaded in a separate defense of assumption of risk.

Only one kind of assumption of risk in a master-servant case is not covered by a well-pleaded defense of contributory negligence. This is the assumption of those risks which are inherent in the work at the time of the employment. Continuing to work in light of changed conditions which put the plaintiff on notice of a new hazard inherent in the work may also be an assumption of risk. In such event, if the workman has actual knowledge of such conditions, he may make an intelligent choice either to continue to work or to give up the position. Restatement, 2 Agency 1220, § 521; 35 Am Jur 725, Master and servant § 301. But such changed conditions must not result from the negligence of the employer.

■ The rule that a workman voluntarily assumes only those risks inherent in the work, and not the risks arising out of the employer's negligence, is sometimes called the "Missouri doctrine." 35 Am Jur 726, Master and Servant § 301, supra. Whether or not this is the majority rule, it is sound.

This court has held in cases in which assumption of risk was recognized as a defense that a workman did not as a matter of law assume risks created by

the negligence of the employer. In *Hamilton v. Redeman,* 163 Or 324, 97 P2d 194, where a farm hand was seeking recovery against an employer who contended that the plaintiff had assumed the risk, Mr. Justice ROSSMAN, speaking for the court, recognized the difference between the risks ordinarily inherent in the work and the extraordinary risks arising from the employer's failure to exercise reasonable care. The court held that it was a jury question whether the plaintiff voluntarily placed himself in a position of known peril. To like effect see *Adams v. Corvallis & E. R. Co.,* 78 Or 117, 152 P 504, and cases cited therein. And see Restatement, Agency § 521.

If the facts show that the plaintiff sustained injury from a foreseeable hazard inherent in the employment, there may be some justification for invoking the separate defense of assumption of risk. It is not then a question of fault, but a question of permitting persons *sui juris* to engage in work which might produce some harmful effect on the workman. See cases collected in Annotation, 48 ALR 1295, 1303. As noted elsewhere, this common-law solicitude for rugged individualism has given way for the most part to social legislation. See Prosser, Torts (2d ed, 1955) 379.

The defendants rely upon a number of early Oregon decisions for the proposition that a workman may be barred by "common-law" assumption of risk, including the hazards created by the negligence of the employer. It is interesting to note that the cases which support the defendants' position in this respect are almost without exception cases involving hazardous occupations before the enactment of the various remedial legislation to which reference has been made. We believe no useful purpose would be served by extending this opinion to accommodate a long list of

early decisions merely to indicate that they are overruled. For all practical purposes, those decisions which antedate the Employers' Liability Law have been overruled by decisions under that statute and have been at rest too long to need further consideration at this time. Insofar as the dignity of "common-law" origin is concerned, the doctrine of assumption of risk in master-and-servant cases enjoyed only a brief reign at best. The beginning of the end came in England in 1880 with the enactment of 43 and 44 Vict, ch 42. A recent summary of the rise and fall of assumption of risk in the United States may be found in 2 Harper and James, The Law of Torts (1956) 1175-1179, § 21.4. And see Prosser, Torts (2d ed, 1955) 303; Bohlen, *Voluntary Assumption of Risk,* 20 Harv L Rev 14.

While none will deny the value of certainty in the law, it does not follow that tort-feasors have a vested interest in early cases which may have afforded some immunity from liability for fault in times past.

■ Where the complaint alleges that the defendant negligently created a hazardous condition, the answer that the plaintiff voluntarily exposed herself to an unreasonable hazard alleges contributory negligence. The trial judge can instruct the jury on contributory negligence and causation without confusing the jury by introducing a completely separate concept that even the most casual study will demonstrate has been confusing to lawyers and judges. 35 Am Jur 725, Master and Servant § 301, supra.

One of the clearest statements of the distinction between assumption of risk and contributory negligence (by voluntary exposure to a known hazard created through the negligence of another) is found in the recent New Jersey case of *Meistrich v. Casino*

*Arena Attractions, Inc.,* 31 NJ 44, 155 A2d 90. Chief Justice Weintraub, speaking for the court, traced the history of assumption of risk in its exact sense, and showed how the confusion between assumption of risk and contributory negligence had crept into the cases. We quote:

> "Hence we think it is clear that assumption of risk in its secondary sense is a mere phase of contributory negligence, the total issue being whether a reasonably prudent man in the exercise of due care (a) would have incurred the risk and (b) if he would, whether such a person in the light of all the circumstances including the appreciated risk would have conducted himself in the manner in which the plaintiff acted." 31 NJ at 54.

On a second trial, it should be borne in mind that the real issue in the case involves the element of fault. If the defendants are free from negligence, that ends the matter and there is no need to inquire whether plaintiff assumed the risks incidental to the employment without fault on the part of the employer. If the jury finds that the defendants were negligent, then it turns its attention to fault on the part of the plaintiff. In this respect, as shown above, if the plaintiff voluntarily placed herself in a position of appreciated hazard, then the jury may find that her own negligence was a contributing cause of the accident. Assumption of risk, as such, becomes redundant.

The defendants next contend in support of their judgment n.o.v. that there was no evidence that the failure of the defendants to provide handrails on the ramp was the proximate cause of the plaintiff's injury. It is argued that Mrs. Ritter might have fallen anyway. The answer to this contention is that the jury found, upon adequate evidence, that Mrs. Ritter fell off the ramp. The jury might well have found that she

would not have fallen off the ramp, or that her injuries, if any, would have been much less severe had the handrails been provided. The question of proximate cause was for the jury. *Staples v. Senders,* 164 Or 244, see opinion on rehearing at 258, 96 P2d 215, 101 P2d 232.

Except for Beals, the employer, and Gardner, who built the ramp, the trial court was asked to enter judgment n.o.v. in favor of the other defendants on the ground that there was no evidence connecting them with the negligence alleged by the plaintiff.

Without going into all the peculiarities of the trust agreement, it is sufficient to observe that it created a relationship in which Beals and the trustees all shared in the management of Beals' property and affairs. Beals contracted for his household supplies and the trustees paid the bills. Beals hired the housekeeper and the trustees paid her wages. The defendant Gardner testified that the trustees allowed Beals to operate his household so long as he was able to. He also testified that the trustees participated in the management from time to time.

Gardner testified concerning the employment of the housekeeper:

"Well, I met Mrs. Ritter and I think at a later time Mr. Beals, of course, asked me what I thought of her and I said I thought she would be fine. Then I think she was hired before I talked to her again."

With the relationship of the trustees and the settlor-beneficiary in this condition, the jury could have found that all the defendants were chargeable with negligence. Some of the defendants were passive trustees charged as employers and property managers; the secretary was charged as a negligent trustee and as an

employer; and Beals is both an employer and the settlor-beneficiary of the trust. Beals could have been liable as an employer if there had been no trust at all. Likewise, the trustees could have been liable as employers because of their management functions if Beals had been entirely passive in the trust relationship.

The jury was instructed in the duties imposed upon employers. Throughout the instructions the trustees and Beals were referred to as "the defendants" without distinction. If there was joint control over the property, as the evidence showed there was, then all would be liable for the results of their failure to provide a safe place in which to work. We have not found a similar case which considers the joint liability of settlors and beneficiaries of trusts with that of trustees. We find in 3 Scott, Trusts (2d ed) 2116, § 276: "So also of course a beneficiary may be a joint tortfeasor with the trustee as where he instigates or participates in the tort committed by the trustee." And see Restatement, 2 Trusts 845, § 276 (d): "The beneficiary may become a joint tortfeasor with the trustee. If the beneficiary instigates or participates in the tort committed by the trustee, he is subject to liability for the tort."

The foregoing texts provide a workable rule. Where the evidence was that the settlor of the trust was not only a beneficiary but that he also exercised some management functions, no error was committed in submitting the question of liability to the jury on the theory that all of the defendants would be liable if there was negligence on the part of the trustees in their managerial capacity.

In view of our disposition of the grounds contended for in the motion for a judgment n.o.v., we hold that it was error to enter judgment for the defendants.

■ The first assignment of error on the cross-appeal is directed against the ruling of the trial judge which permitted an architect to testify that in his opinion the ramp was unsafe. In examining the whole of the architect's testimony, we find adequate support for the proposition that his opinion on the matter was fully grounded in professional appraisal of objective facts, and that no error was committed in permitting him to testify. The jury could have found that the ramp was unsafe without the aid of the architect, but it was not error to give the jury the benefit of his learning. The architect testified that a ratio of one foot of vertical fall in 4.6 feet of horizontal run was steeper than that ordinarily found in such ramps. He testified that a ratio of seven to one is the minimum ordinarily employed in constructing ramps for wheel chairs.

The defendants, citing Oregon cases, urge that when the witness testified that in his opinion the ramp was unsafe he was permitted to invade the province of the jury. The plaintiff, also citing Oregon cases, contends that an opinion on an ultimate fact is permissible when the ultimate fact cannot be found by the jury without expert assistance. These rival contentions are illustrative of the state of the law of evidence on this point elsewhere. See 7 Wigmore, Evidence (3d ed) 18, § 1921. Imposing lines of authority can be found which intone the liturgical phrases about the province of the jury. Equally respectable authority can be found to the contrary.

For example, after this court held in *Schweiger et ux v. Solbeck et ux,* 191 Or 454, 472, 230 P2d 195, 29 ALR2d 435, that an expert may express an opinion on the very issue before the jury, citing earlier Oregon cases, we then employed the "province of the jury"

language in a passing reference in *Bailey v. Rhodes, Adm.,* 202 Or 511, 523, 276 P2d 713. The cases are not inconsistent, but the language taken out of context can be misleading.

The correct rule is that an expert's fitness to answer opinion questions must first satisfy the discretion of the trial judge. The expert then may express an opinion on an ultimate fact if the ultimate fact cannot be equally well decided by the jury from the same evidence upon which the expert has based his opinion. *Welter, Adm'x v. M & M Woodworking Co.,* 216 Or 266, 278, 338 P2d 651; *Darling v. Semler,* 145 Or 259, 27 P2d 886; *Goldfoot v. Lofgren,* 135 Or 533, 541, 296 P 843. The decision whether to receive the testimony should be left to the sound discretion of the trial judge. Following the preliminary screening by the trial judge, the jury ultimately passes upon the credibility of the witness, the soundness of his judgment, and the existence of the facts upon which his opinion was predicated. *Goldfoot v. Lofgren,* supra.

When this court is called upon to decide whether or not a trial judge abused his discretion in a given discretionary ruling, it is appropriate to consider the entire context in which the testimony is offered. In the instant case, the architect was asked to consider objective facts. He then gave his opinion of acceptable construction methods. At that point the jury was not equally able to decide whether the ramp in question was too steep for safety. The witness stated that in his opinion it was unsafe. The jury did not have to accept the opinion, and it was subject to all the cautionary instructions given at the close of the trial. The opinion was, however, relevant, and helpful. No error was committed in permitting the witness to so

testify. Obviously, if the witness had been a layman, with no special training, and no expert knowledge of the factor of steepness that would make a ramp safe or unsafe, his testimony would have been of no value, as the jury could have equally arrived at the same opinion from the same evidence. This latter point was taken into consideration by the trial judge when he excluded the architect's views on the effect of the absence of handrails for the reason that a jury of laymen could appraise equally well the evidence on that score.

■ The defendants assign error to the refusal of the trial court to withdraw from the consideration of the jury the plaintiff's allegation of negligence in failing to provide sufficient workmen to accomplish the task of moving the wheel chair safely. In this respect the evidence supports the position taken by the defendants. There was no evidence that the defendants were negligent in not providing additional helpers. From what the record discloses concerning the nature of the wheel chair, it is unlikely that more than one person could conveniently handle the device. There was ample evidence of negligence in other particulars charged by the plaintiff, but none to support the contention that additional practical nurses must be kept on a stand-by basis to move wheel chairs. The allegation should have been withdrawn.

■ The remaining assignment of error challenges an instruction given by the trial court to the effect that the jury could consider the permanency of the plaintiff's injuries, including permanent aggravation of her diabetes. The instruction was duly excepted to. The defendants point out that there was no evidence that any aggravation of diabetes would be permanent.

Dr. Kaliher was the only medical witness. We quote from his testimony:

"Q Doctor, did this lady sustain permanent injuries, in your opinion—from this accident?
"A Yes.

"Q Will she always have pain and disability as a result of the injury?
"A I thought so immediately after the accident and I told her so and I told the family, and I still think so.

"Q Dr. Kaliher, did you have any problem with this lady concerning diabetes, in the control of sugar content, while she was in the hospital?
"A I wouldn't say it was any great problem. The usual thing that you have to watch closely is the food intake of a diabetic, particularly when you change the type of activity that they have. Change from an active life and put to bed there is a difference in their need for food, insulin, and so forth. It has to be cared for, but I don't know that you would particularly class it as a problem. We did change her diet, and change her intake.

"Q Did the accident itself then, and the result of the injuries and the things that go on in the body then affect immediately her diabetes; was there any aggravation of it at that time, temporary or—
"A No, I don't think you could say there was any aggravation of it.

"Q Well, what effect does tension have on a diabetic.
"A I suppose the same effect it does on every other individual. It tends to magnify the symptoms.

"Q Does an injury, when a person is injured, do they become ordinarily more tense?
"A I think a painful injury would make any one more tense.

"Q Did this lady have a painful injury?
"A Yes, she had considerable pain."

The court told the jury, "Now on the subject of damages, the plaintiff has alleged *. * * Severe bruises and contusions * * * fractures of the bones of her right arm and wrists, a severe tearing, twisting and wrenching of the muscles of her right shoulder and severe aggravation of pre-existing diabetes and high blood pressure, from all of which * * * she has permanent injuries to her right arm and shoulder, and permanent aggravation of her diabetes and high blood pressure.

"Now in connection with those claims which plaintiff makes in her Amended Complaint I am withdrawing from your consideration at this time any claim that the accident which plaintiff sustained aggravated her high blood pressure for the reason that there is no proof which would permit you to reach such conclusion."

The defendants saved an exception to the instruction because it not only left permanent aggravation of diabetes in the case, but it did so rather conspicuously by withdrawing the alleged aggravation of high blood pressure.

The giving of the quoted instruction was error requiring a new trial. There was no evidence that the plaintiff's diabetes was permanently aggravated, and the only witness who testified on the subject stated that it was not.

The judgment notwithstanding the verdict is reversed, and the cause is remanded for a new trial.

PERRY, J., dissenting.

I am unable to agree with the majority in reversing the trial court's order granting the defendants a judgment non obstante veredicto.

The rule of law effecting liability of a master for

injuries suffered by an employee, spoken of as assumption of risk, is set forth by this court in an approved instruction in *Hagermann v. Chapman Timber Co.,* 65 Or 588, 594, 133 P 342.

> " 'If you find from the evidence that at the time plaintiff was hurt, he was just as well aware of the danger of doing said work under the conditions existing at said time as his employer was, and that such danger was open and obvious, and could have been discovered by the plaintiff by the use of ordinary care, then I instruct you that Hagermann assumed the risk and cannot recover, and your verdict should be for the defendant.' "

This rule of law has been followed consistently by this court in all cases involving this rule of law. *Holmberg v. Jacobs,* 77 Or 246, 150 P 284; *Filkins v. Post Lbr. Co.,* 71 Or 249, 142 P 578; *Westman v. Wind River Lum. Co.,* 50 Or 137, 91 P 478; *Blust v. Pacific Telephone Co.,* 48 Or 34, 84 P 847; *Roth v. N.P.L. Co.,* 18 Or 205, 22 P 842.

This in essence is the same rule of law relative to the assumption of risk by a third party who does not stand in a servant relationship to a defendant. " * * * the rule of law is that one who voluntarily assumes a position of danger, the hazards of which he understands and appreciates, cannot recover for an injury from a risk incident to the position: * * *." *Carroll v. Grande Ronde Elec. Co.,* 47 Or 424, 442, 84 P 389, cited with approval in *Bockman v. Mitchell Bros. Truck Lines,* 213 Or 88, 320 P2d 266, and *Jamerson, Adm'x., v. Witt, Executrix,* 215 Or 227, 242, 332 P2d 1054.

So, in either case, whether we use assumption of risk in the sense that it arises out of the contractual relationship existing between master and servant, or assumption of risk as known in the law of contributory

negligence, the rule for all practical purposes is the same,—knowledge of danger and an apparent willingness to encounter the risks involved in the known situation.

In *Bockman v. Mitchell Bros. Truck Lines*, supra, p. 95, this court said:

"We think the conduct of a plaintiff who voluntarily assumes a position of known risk in a case such as this is properly called contributory negligence. We will not enlarge this opinion by considering whether it is technically precise to also describe it as assumption of risk. Some decisions and texts do so but the use of that term has not changed the standards by which the conduct is measured. We refer those interested in further pursuing the subject to Hunt v. Portland Baseball Club, 207 Or 337, 296 P2d 495, Prosser, Torts (2nd ed) 303, § 55 and 2 Restatement, Torts 1230, § 466."

The majority state:

"The fact that Mrs. Ritter expressed doubt about the safety of the ramp and wanted to test it before subjecting her patient to what she thought might be a hazard is evidence of doubt, not evidence of knowledge."

Citing as authority *Millen v. Pacific Bridge Co.*, 51 Or 538, 553, 95 P 196.

The facts in the case cited are so different from those present here that in my opinion the case will not support the position of the majority.

In *Millen v. Pacific Bridge Co.*, supra, 51 Or 538, 548-549, 550-551, the court states the facts as follows:

"* * * The evidence discloses that Larsen, plaintiff's intestate, was employed by defendant on the 19th of April as a common laborer to shovel dirt and assist in that capacity to dig a trench for

the construction of a sewer. At that time the trench on Thompson street lacked about 8 feet of being completed. On the 20th he assisted in digging out a portion of this eight feet of earth. At different places, and wherever needed, defendant had previously shored up and protected with timber the banks or walls of this trench to prevent it from falling or caving upon its employees while they were engaged at work therein. This had been done by one of its servants employed for that particular duty, and was not required to be done by those engaged to dig and shovel dirt. But no supports or timbers had been placed across the perpendicular wall or bank at the end of this open trench where the tunnel was to begin, excepting one brace which had been placed about 3 feet from the top of the bank, but slightly removed from it; the intention being to put lagging or planks behind it to hold the earth in place, but this was not done. On the next day, when Larsen returned to work, he and another employee were directed to begin digging into the face of this bank. They had been working about three hours when a quantity of earth broke off the face of the bank just above and at the entrance of the tunnel fell on Larsen and so injured him that he soon thereafter died. The testimony is conflicting as to how far into the bank the tunnel had been excavated when the accident occurred, but it is stated by some witnesses for plaintiff that its extreme depth was six feet. All agree that it was six feet high and six feet wide, presumably the intended dimensions of the tunnel when completed. At the time of receiving the injury Larsen could not have been entirely within the tunnel, but was just at the entrance thereof, for the body of falling earth came from the northeast corner of the 'face' or entrance thereof, and, according to the testimony of J. S. Reagan, defendant's witness, the bulk of it came from the bank above the entrance and extended from the surface of the ground down to the roof of the tunnel. The place where Larsen was put to work had been created by defendant before it

employed him, and that it was a dangerous place the casualty establishes. There is evidence that the defendant knew, or was bound to know, of the imminence of that danger. It is contended by defendant, however, that the danger was so apparent, open, and manifest that a person of ordinary intelligence could observe and appreciate it, and that Larsen, when he first entered the trench, then about 25 or 26 feet deep, must have seen that the end thereof was not shored, and that to dig into the base of a perpendicular bank of that height and undermine it would cause the unsupported part above to fall upon and injure him; that this danger was so apparent and obvious to him that the law will not permit him to deny knowledge of the ordinary and universal law of nature—the law of gravity.

"* * * * *

"The evidence shows that at the place where the tunnel was to be dug the earth was composed of clay and loam which, when not undermined, would ordinarily stand at a perpendicular height of 28 feet. But the defendant knew that it had been necessary in some places to shore up the sides of the sewer trench to prevent it from caving upon its employees, and it had expended a large sum of money in doing so. It also knew that a day or two before this accident occurred a dangerous crack had appeared on Seventh street close to the bank of the trench at the opposite end of this strip of ground 17 feet long, which was to be tunneled. And after Larsen went to work defendant's superintendent, O'Neil, came into the trench and marked upon the wall or end thereof where the tunnel was to be dug, and told one Barnes, a co-employee, to put the men to work at that place. Barnes testifies that after Larsen had gone to work he had a talk with O'Neil about the kind of ground they were to tunnel. The conversation given is as follows: 'I said I thought the dirt was rotten and would not stand. He said he thought it would. I didn't know anything about the crack on the Seventh street

end. The dirt on the Seventh street end and on Thompson street was apparently the same.' From plaintiff's testimony it appears that in the evening of the day before, or two days before, the accident happened, O'Neil had observed a serious crack in the street at or near the opposite end of this section which was to be tunneled, and for that reason refused to allow the night shift to work that night, but sent them home. But there is no evidence that Larsen knew anything of this."

The court then states, pages 552-553:

"Can it be said, as a matter of law, that the circumstances related in this record show conclusively that the extraordinary risk and danger of this bank caving was so obvious to an ordinarily intelligent person that it would be perceived and appreciated at once? Mr. Chief Justice MOORE, in Johnston v. O.S.L. & U.N. Ry. Co. 23 Or. 95—105 (31 Pac. 283, 286), has defined such a risk as follows: 'An open, visible risk is such a one as would in an instant appeal to the senses of an intelligent person: Wood, Mas. & Serv. 763. It is so patent that it would be instantly recognized by a person familiar with the business. It is a risk about which there can be no difference of opinion in the minds of intelligent persons accustomed to the service. It is not expected that the servant will make close scrutiny into all the details of the instrumentalities with which he deals. His employment forbids that he should thus spend his time.' The disastrous result shows that the work which Larsen was directed to perform and was performing was highly dangerous, and indicates that before attempting it, precautions should have been taken to prevent the earth caving. The record shows quite clearly that defendant's superintendent knew it was dangerous, but we are not able to say that the facts show conclusively that Larsen knew the facts or appreciated the danger. The question whether it would be safe to dig a tunnel into the particular bank in question depends upon something else besides the height of

the bank, and it not being timbered or shored, but rather upon the cohesiveness of the soil and other collateral facts. It was not a *danger so patent that it would be involuntarily recognized by one inexperienced and unfamiliar with the business, as is plainly shown by the testimony of Barnes, who says that O'Neil thought the tunnel could safely be dug without timbering, while he did not.*" (Italics supplied.)

The above case dealt with the question of whether a reasonable person would know of defects making the work dangerous. If a reasonable person would not know of the defects, but must only surmise the conditions, this was not the equivalent of knowledge and it cannot therefore be said a person appreciated the risk. This issue is not before this court in the case at bar, because, as will later be pointed out, the plaintiff stated she knew of all the defects in the ramp.

If I correctly understand the opinion of the majority, they say, even if it be established the plaintiff knew of the defects in the ramp, she would not be guilty of contributory negligence, because it might be said plaintiff was not conscious of the danger to herself, but "Mrs. Ritter was afraid her patient might be hurt," and thus there was a question for the jury.

This is a new and novel approach I have never before encountered in the law. If this be true, persons would be excused from a charge of contributory negligence or assumption of risk in taking hold of a negligently permitted live wire, because, while they knew the wire was charged with electricity, they just wanted to push the wire away because a friend or relative passing that way might grasp the wire, and they were thinking of what might happen to the other party and not of what might happen to themselves.

The rule of law, as I have always understood it to be, is not what the particular plaintiff thought or did, but what the mythical "reasonably prudent person" would have done under the same or similar circumstances with knowledge of the circumstances then existing. See 2 Restatement, Torts, Contributory Negligence § 475, Standard of Conduct.

That the majority know this to be the rule is clearly pointed out in the case of *Shields v. W. R. Grace & Co.*, 91 Or 187, 201, 179 P 265, from which they quote:

> "6. The mere fact that the servant observed the physical conditions existing at the time of his employment, does not of itself imply an assumption of the risks of such conditions *unless they were so obvious as to impress their danger upon the mind of a person of ordinary care and prudence.* * * *"* (Italics supplied.)

The case before us is much clearer for it is unnecessary to show that "such conditions" were "obvious." The plaintiff testified she knew of the dangerous conditions.

The plaintiff, relative to her charge that the ramp was too steep, testified as follows:

> "A As soon as they got the first board on, I said, 'It is going to be that steep?' and one of them said, 'Yes'. And I said, 'That ramp will be too steep.' I don't remember which answered me, or whether either answered me. But I stood there and looked a few minutes and turned around and went back in because my three grandchildren were there and my daughter-in-law, from Cloverdale, and I went back in to be with them.
> "* * * * *

"Q Now you said you had some conversation with Mr. Gardner, I think, about how steep the ramp was?

"A I said, 'The ramp is too steep', when I went out one time and they had the first plank on.

"Q And that was also based on your experience and training in the use of—

"A Yes, *because it was really too steep for one to be safe on.* (Italics supplied.)

"Q Yes. What I was going to ask you—that was based upon your experience and your training in the use of wheelchairs and ramps?

"A Yes.

"Q And you knew about that and you knew that it was too steep and appreciated the danger of it; is that right?

"A Yes.

"Q And that's why you talked about it?

"A That's why I asked about it.

"Q And when you asked about it what was said?

"A I don't remember.

"Q Anyway, that was the same steepness as they wound up building the ramp; is that right?

"A It was just finished as it was started."

Relative to the fact that there were no handrails and, because of their lack, plaintiff charged negligence. She testified as follows:

"A I had asked something about the handrails, 'Aren't we going to have handrails' or rails, on the ramp.

"Q Who did you ask that of?

"A I think I was just talking to Mr. Gardner and Mr. Bales out there working. I was standing on the back porch at the door, talking.

"Q You think you asked Mr. Gardner that?

"A I don't know whether it was Mr. Gardner.

I think it was both, not one, but both, is the way I would say.

"Q And you asked them about handrails, whether there would be handrails; is that right?

"A That's right.

"Q And they said 'No'?

"A They said, 'Not now'.

"Q And did you ask Mr. Beals about handrails?

"A I don't remember asking Mr. Beals.

"Q Then you were concerned about the handrails?

"A I was.

"Q Because you knew about the use of wheelchairs on ramps?

"A Yes.

"* * * * *

"Q Based on what you knew about these ramps and wheelchairs on them you appreciated the situation of not having handrails, did you not?

"A Well, I knew they were needed.

"Q And you knew there weren't any there when you went to use it?

"A I did."

Plaintiff's own statements show there can be no question but that plaintiff knew the ramp was too steep for its intended purpose and that she appreciated this fact. It is equally clear plaintiff knew the ramp without handrails was unsafe for the intended purpose.

Plaintiff also stated: "I would judge [speaking of plaintiff's patient] at that time he weighed 185 or better." In speaking of the method of using a wheelchair: "Q. Is it the practice in nursing to back it down? A. Yes."

With all these facts known to plaintiff let us see what she did:

"A I said I would be afraid to take Mr. Beals down that ramp without trying it first on someone because it was too steep.

"Q What did Mr. Gardner say?
"A He said he would go for a ride with me, so he went for a ride all right.

"Q What kind of a ride? Where was the chair?
"A The chair was on the front porch. It was a glassed in porch at the time. I brought it in the house. He put boards in to make the wheel chair go easier from the porch into the main building. Then he fixed one on the back porch for Mr. Beals so I could get the chair up easier without turning and lifting. I took him up over that, over the front porch into the living room and hall and out on the back porch of the house. And I turned the chair to go out backwards.

"Q Why did you do that?
"A Because that was the way we were taught to take care of a patient.

"Q What was the reason?
"A Patients could fall out of a chair on their faces and be injured.
"* * * * *

"Q You then turned the chair and started backward?
"A Yes, I did.

"Q There were handle bars to hold onto; is that right?
"A Yes.

"Q Are you able to tell the jury, Mrs. Ritter, about how far you got down the ramp before you fell? Are you able to tell that?
"A Well, I took a few steps down the ramp *and the chair was coming too fast for me* and I know I put my left foot against the wheel and somehow I pitched back onto my right side." (Italics supplied.)

It should be noted in passing that the plaintiff was not being required by her employer to use the ramp. She had previously taken her patient down the steps, but now felt this was too hard for her.

Now, I think it must be conceded from plaintiff's own statements that the sole purpose of having the defendant Gardner get into the wheel chair was to make a test for the purpose of determining whether the plaintiff was strong enough to control the downward descent of the occupied wheelchair on a ramp that was too steep and had no handrails.

I think it must also be conceded that persons who know anything about the law of gravity would know that if they were not strong enough to hold the occupied chair on wheels on its descent, the chair with this additional weight would push against them and they would either be run over or pushed off of the ramp. It is certain that the plaintiff did know something about the law of gravity because she speaks of the steepness of the ramp.

I cannot believe that reasonable minds can reach any other conclusion but that plaintiff knew the ramp was defective and that she was willing to "voluntarily assume a position of danger" to test the use of the ramp.

I would affirm the judgment of the trial court.